Candace Anne CARELL Plaintiff,

v.

THE SHUBERT ORGANIZATION, INC.; John Napier; the Really Useful Group, Ltd.; the Really Useful Theatre Company, Ltd.; Really Useful Films, Ltd.; the Cats Company; Polygram NV; Universal Music Group, Inc.; Cameron Mackintosh, Inc.; Flummery Corporation; Nina Lannan Associates, Inc.; Polygram Video; Polygram Records, Inc.; Gerald Schoenfeld; Andrew Lloyd Weber; David Geffen; and Cameron Mackintosh, Defendants.

No. 99 Civ. 4997(AGS).

United States District Court, S.D. New York.

June 27, 2000.

Russell Alexander Smith, Judith Jobin, Law Offices of Russell Alexander Smith, New York City, for plaintiff.

David Rabinowitz, Moses I. Singer, New York City, for defendants.

### OPINION AND ORDER

SCHWARTZ, District Judge.

### FACTUAL BACKGROUND

This action arises out of a dispute concerning the copyright in certain makeup designs (the "Makeup Designs" or "Designs") created for the cast of the Broadway musical *Cats* ("*Cats*" or "the musical"). Plaintiff Candace Anne Carell ("plaintiff") filed this action on July 12, 1999, asserting claims for copyright infringement, false designation of origin, antitrust violations, and an accounting for profits, arising out of defendants' use and publication of the Makeup Designs. Plaintiff also seeks a declaration of sole ownership of the copyright in the Designs. Currently before the Court is defendants' motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) ("Rule 12(b)(6)") and as to certain defendants pursuant to Fed. R.Civ.P. 12(b)(2) ("Rule 12(b)(2)"). For the reasons set forth below, the motion is granted in part and denied in part.

### I. The Parties and Subject Matter

Plaintiff, a makeup designer and artist, was the makeup designer for the New York production of *Cats*.[1] (Complaint ("Compl.") ¶ 1, 162.) The 18 defendants include entities and individuals engaged in

---

1. The Court notes that while plaintiff was the makeup artist for the first *Cats* company (the "National I" company), she was not chosen as the makeup artist for the National II Company, which began performances in 1985. (Compl.¶¶ 69–71.) The Complaint further notes that, in 1991, plaintiff worked on the *Cats* production in Mexico, purportedly because producers in Mexico requested the musical's "original makeup designer." (*Id.* ¶ 74.)

producing or in licensing the rights to *Cats*, or who own an interest in corporations that have been and are so engaged. Defendants are: (1) The Shubert Organization, Inc. ("Shubert"), a New York corporation that is a producer of *Cats* and a licensee of defendant The Really Useful Group, Ltd. (*Id.* ¶ 163); (2) John Napier ("Napier"), the set and costume designer for the musical (*Id.* ¶ 3); (3) The Really Useful Group, Ltd. (formerly Really Useful Company, Ltd.) ("RUG"), a British corporation that is among the producers or licensors of *Cats* productions in New York and overseas (*Id.* ¶ 165); (4) The Really Useful Theatre Co., Ltd. ("RUT"), a British corporation that is among the producers or licensors of *Cats* (*Id.* ¶ 166); Really Useful Films, Ltd. ("RUF"), a British corporation that is among the producers or licensors of *Cats* (*Id.* ¶ 167); (6) Really Useful Holdings, Ltd. ("RUH"), a British corporation that is among the producers or licensors of *Cats* (*Id.* ¶ 168); (7) The Cats Company, an organization that is among the producers of *Cats* and is controlled by defendant Shubert (*Id.* ¶¶ 10 n. 1, 169); (8) Polygram NV, a Netherlands corporation that owned approximately 30 percent of defendants RUG and/or RUT from 1991 to December 1998 (*Id.* ¶ 170); (9) Universal Music Group, Inc., a California corporation that acquired defendant Polygram NV and owned 30 percent of defendants RUG and/or RUT from December 1998 to mid-April 1999 (*Id.* ¶ 171); (10) Cameron Mackintosh, Inc., a Delaware corporation owned by individual defendant Cameron Mackintosh that is among the producers of *Cats* productions in London and New York (*Id.* ¶ 172, 180); (11) Flummery Corporation, a New York corporation that is the official licensing agent for *Cats* (*Id.* ¶ 173); (12) Nina Lannan Associates, Inc. (formerly The Nina Lannan Management Company, a division of defendant RUG from 1993 to 1997), a New York corporation that is one of the managers of defendant The Cats Company (*Id.* ¶¶ 10 n. 1, 174); (13) Polygram Video, a division of defendant

Polygram Records, Inc. that manufactured and marketed the video version of *Cats* (*Id.* ¶ 175); (14) Polygram Records, Inc., a Delaware corporation of which Polygram Video is a division (*Id.* ¶ 176); (15) Gerald Schoenfeld ("Schoenfeld"), chairman of defendant Shubert (*Id.* ¶ 177); (16) Andrew Lloyd Webber ("Webber"), producer of the video version of *Cats* and sole or majority owner of defendant Really Useful businesses (*Id.* ¶¶ 163, 178); (17) David Geffen ("Geffen"), a producer of the New York productions of *Cats* (*Id.* ¶ 179); and (18) Cameron Mackintosh ("Mackintosh"), a producer and/or licensor of *Cats* productions and sole or part owner of defendant Cameron Mackintosh, Inc. (*Id.* ¶ 180.)

## II. Plaintiff's Contract and Creation of the Makeup Designs

*Cats* is reportedly "the longest running, most financially successful property" in the history of American theater. (*Id.* ¶ 9.) There have been over 40 productions of the musical in 27 countries, and within the last three years there has been a United States tour, European tour, and productions in Budapest, Hamburg and Tokyo.[2] (*Id.* ¶ 66–67.)

The musical opened in London, England in May 1981, and is still running there. (*Id.* ¶ 34.) Early in 1982, plaintiff heard that *Cats* was coming to New York City and contacted the musical's executive producer and manager, R. Tyler Gatchell, about designing the cast's makeup. (*Id.* ¶ 31.) Communications between plaintiff, Gatchell and Napier followed, and in March 1982, The Cats Company commissioned plaintiff to create the Makeup Designs for the musical's New York productions. (*Id.* ¶¶ 31–32, 58.)

Napier allegedly told plaintiff that he wanted her "pure imagination" for the creation of the Designs, and plaintiff "promised to create something beautiful." (*Id.* ¶¶ 5, 32.) Plaintiff was cautioned not to read the poems on which the musical is

---

**2.** *Cats* is still running in the United States, but it is scheduled to close in September 2000.

based, nor to see the London production. (*Id.* ¶ 32.) In August 1982, approximately two months before *Cats* opened at the Winter Garden Theatre (the "Theatre") in New York City, plaintiff and Napier began what plaintiff terms a "collaboration" on the Designs. (*Id.* ¶ 37.)

Napier provided ideas for the makeup for at least two of the *Cats* characters. In particular, one of plaintiff's first creations was the "White Cat," which Napier suggested should be "soft, white, and sensual." (*Id.* ¶ 41.) Grizabella was to be "full of aging beauty and despair, confronting her mortality." (*Id.*) Plaintiff contends that, for these characters, she gave Napier's ideas full expression in her Design. (*Id.* ¶ 42.) Each Design contains a number of elements that "hel[p] turn human faces catlike." (*Id.* ¶ 44.) Moreover, their application involves "extensive layering." (*Id.* ¶ 45.) Plaintiff notes that some were created with six or seven layers and originally took as long as an hour and a half to apply. (*Id.*)

In certain cases, plaintiff and Napier "both did hands work on a design." (*Id.* ¶ 43.) In most of these cases, plaintiff created the Design and Napier made adjustments and suggestions. On "rare occasions," Napier created the Design and plaintiff made alterations and suggestions. (*Id.*) During these design sessions, Napier did not show plaintiff Napier's costume sketches from the London production of *Cats.* (*Id.* ¶¶ 5, 38.)

While the Makeup Designs were completed by the end of September 1982, plaintiff's contract was made final on or about July 7, 1983.[3] (*Id.* ¶¶ 54, 58, 59.) The contract provided for a flat fee to plaintiff of $2,000 for "executing makeup designs," a weekly payment of $750 beginning September 20, 1982 (after the Designs had been created) and ending shortly after opening night, and a weekly stipend of $200 for the run of the show in return for plaintiff's "ongoing supervisory services."[4] (*Id.* ¶¶ 56, 59.) Plaintiff therefore receives annual compensation of more than $10,000 and, in total, has received over $170,000. (Defendants' Memorandum of Law in Support of Motion to Dismiss ("Def.'s Mem. Law") at 4.) During the period of creation, plaintiff also worked full time for the NBC television network, except for a brief period of leave before previews began during which she was paid the $750 weekly payment noted above. (Compl. ¶¶ 49–50.)

Plaintiff has received wide recognition for the creation of the Makeup Designs. While she is not listed as one of Napier's assistants in the playbill for the musical's New York production, she is credited in a "stand-alone" playbill credit that reads: "Makeup by Candace Carell." (*Id.* ¶ 4.) Plaintiff asserts that she has regularly conducted interviews as the musical's makeup designer (*Id.* ¶¶ 63–64), participated in photo shoots with *Cats* characters (*Id.* ¶¶ 46–49), and was credited as the musical's makeup designer by the *New York Times.* (*Id.* ¶¶ 7, 65.)

### III. Competing Registrations and Ownership Claims

Plaintiff's contract makes no reference to copyrights in the Makeup Designs. (*Id.* ¶¶ 20, 56, 60.) According to plaintiff, Napier's contract for the New York production of *Cats,* executed in early August 1982, did address copyrights by providing for Napier to assign his own unspecified copyrights to RUG. (*Id.* ¶ 61.) In 1983 and 1984, plaintiff consulted two lawyers concerning the copyrightability of the Makeup Designs, neither of whom opined that the Designs were copyrightable. (*Id.* ¶¶ 68, 83.) A third, Marc Jacobsen, whom

---

3. The Complaint does not specify the party with whom plaintiff entered into the contract, and the Court has not been provided with any contract.

4. These services include (i) teaching incoming actors their Designs, (ii) preventing incumbent actors from altering the Designs, and (iii) keeping actors' makeup in stock. (Compl. ¶ 52.)

plaintiff consulted in 1986 or 1987, opined that the Designs were copyrightable. (*Id.* ¶ 84.)

Plaintiff also retained an agent and drafted a proposal for three books related to the Makeup Designs, and allegedly received authorization from Nina Lannan, an agent for The Cats Company and RUG, to proceed with the books. (*Id.* ¶¶ 77–78.) Lannan indicated that plaintiff's books would be considered for sale in the Theatre lobby. (*Id.* ¶ 79.) Plaintiff's attorney also contacted Flummery Corporation, the official licensing agent for *Cats.* (*Id.* ¶ 78.) In 1990, plaintiff "often discussed" certain projects, including the books and a makeup kit, with the president of Flummery Corporation and his wife over dinner, and the couple was allegedly enthusiastic about these projects. (*Id.* ¶ 81.)

In October 1990, Jacobsen filed plaintiff's application for copyright registration. (*Id.* ¶ 85.) Plaintiff's Certificate of Registration has an effective date of October 11, 1990, and the certificate was granted on April 8, 1991. (*Id.* ¶¶ 85, 90.) Jacobsen registered the copyright in plaintiff's Designs as a group, and, over plaintiff's objections that Napier be given credit as joint author of certain of the Designs, filed the registration solely in plaintiff's name. (*Id.* ¶ 86; Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Pl.'s Mem. Law) at 10.) Jacobsen allegedly had concluded that all of Napier's contributions were "either *de minimis* or merely uncopyrightable ideas." (*Id.* ¶ 87.) Plaintiff has never "licensed, assigned, or otherwise transferred any of her copyrights" in the Makeup Designs. (*Id.* ¶ 8.)

By letter dated January 10, 1992, Jacobsen informed the managers of The Cats Company of plaintiff's registration, and sought to negotiate a license for the company's use of the Makeup Designs. (*Id.* ¶ 91.) On June 30, 1992, the company's attorney sent plaintiff a letter by certified mail, stating that:

The Cats Company and The Really Useful Company have heard that . . . you are preparing a coloring book or other such book on the *Cats* facial designs and makeup. . . . The drawings and designs of the *Cats* faces have been duly registered for copyright in the United States Copyright Office by The Really Useful Company and are protected by copyright in many other countries throughout the world. If you infringe upon said copyright or trademark, it will constitute a willful infringement thereof, and The Cats Company and/or The Really Useful Company will take such legal action against you as is appropriate.

(*Id.* ¶¶ 92–93; Letter from Edward E. Colton to plaintiff dated June 30, 1992, Ex. D to Affirmation of Judith Jobin in Opposition to Defendants' Motion to Dismiss ("Jobin Aff.").) Copies of the letter were sent, *inter alia,* to Jacobsen, Lannan, and Schoenfeld. (Ex. D to Jobin Aff.) Plaintiff alleges that the letter asserted false information, because defendants had not filed a registration for the Makeup Designs. (Transcript of oral argument held on January 10, 2000 ("Tr.") at 37:16–20.) Plaintiff claims that the letter instead referred to certain of Napier's costume sketches that had been registered incidentally to the registration of the 1983 publication, Cats, *The Book of the Musical.* (Compl. ¶ 97.) Jacobsen's request for a copy of The Cats Company's registration of the "designs of *Cats* faces" went unanswered. (*Id.* ¶ 96.) Because of the threat of litigation, plaintiff subsequently was unable to find a publisher for her proposed books related to the Makeup Designs. (*Id.* ¶ 98.)

In August 1992, The Cats Company's attorney informed Jacobsen that the attorney would seek to cancel plaintiff's copyright registration. (*Id.* ¶ 104.) In March 1993, Napier, Shubert, and RUG petitioned the Copyright Office requesting cancellation of plaintiff's copyright registration in the Makeup Designs. (*Id.* ¶ 105.) Napier asserted in his petition that "the designs of the facial appearances

... were my creation and not those of Candace Carell." (*Id.* ¶ 108.) A letter sent to plaintiff from the Copyright Office on March 31, 1993 stated that Napier had alleged that the registration made with "[plaintiff's] name given as author of the designs and copyright claimant of the designs" states incorrect facts and that Napier "[was] the author and copyright owner of the designs." (Letter from Copyright Office to plaintiff dated March 31, 1993, Ex. A to Jobin Aff.)

Also in 1993, Jacobsen unsuccessfully sought to amend plaintiff's copyright certificate to include Napier as sole author of three Designs and co-author of 15 others, leaving 10 with plaintiff as sole author. (Compl. ¶ 87; Jobin Aff. ¶ 4; Ex. B to Jobin Aff.) Plaintiff contends that Napier and RUG "repudiated co-authorship and co-ownership." (Compl. ¶ 87, 120; Tr. at 34:8–9.)

On July 13, 1993, Napier and RUG registered Napier's costume sketches as "Designs for the Costumes and Facial Expressions of the Characters in the Musical Play *Cats.*" (Compl.¶ 129.) While plaintiff asserts that these "facial expressions" are not the Makeup Designs, (Tr. at 34:1–5, 35:3–5.), the Copyright Office viewed Napier's and RUG's registration and plaintiff's 1990 registration as asserting adverse claims. On June 30, 1994, the Copyright Office informed the parties that the Office had decided not to cancel plaintiff's registration. (Compl. ¶ 125; Letter from Copyright Office to Edward A. Colton, Esq., Ex. B. to Affidavit of David Rabinowitz ("Rabinowitz Aff.").) The notice stated *inter alia* that the "Copyright Office is an office of record, and is not an adjudicator of disputed claims ... it is Copyright Office policy to register both claims ... [and] to leave this matter to the courts to decide the factual issues." (Ex. B. to Rabinowitz Aff.) In addition, the Copyright Office declined to amend plaintiff's certificate to reflect joint authorship with Napier for some of the Designs, citing defendants' explicit rejection of co-authorship of any of the Designs. (Compl. ¶ 126; Pl.'s Mem. Law at 11.)

In 1995, the managers of The Cats Company again allegedly warned plaintiff "not to claim authorship." (Compl. ¶¶ 10 n. 1, 94.) Also in that year, RUG started a toy and game division. (*Id.* ¶ 99.) Through that division, in or about 1997, one of more of the defendants authorized the "creation, production, and distribution" of the "Official *Cats* Coloring and Activity Book." (*Id.* ¶ 101.) The video version of *Cats*, which was taped in England, was, thereafter aired on the Public Broadcasting Service (PBS) television network, and was released for international sale in the fall of 1998. (*Id.* ¶¶ 17, 67, 165.) The video gives credit, *inter alia*, to RUT, RUF, and Schoenfeld, and the makeup design credit to another designer affiliated with defendants. (Jobin Aff. ¶ 7; Compl. ¶ 176.) Also in the fall of 1998, a *Cats* makeup kit entitled the "Face Painting Set" was released, featuring the faces of four *Cats* cast members. (Compl.¶ 102.) Plaintiff states that the "Face Painting Set" omits the name of any author; playbills or similar programs have omitted plaintiff's name and/or credited others for the Makeup Designs; and defendants have published press releases giving credit to Napier for the Designs and omitting credit to plaintiff. (*Id.* ¶ 196.) PBS has also broadcast a video about the making of *Cats* that allegedly excluded plaintiff and featured another designer. (*Id.* ¶ 67.) The Cats Company has acquired an Internet web-site for merchandising these and other products. (*Id.*)

Plaintiff commenced this action on July 12, 1999, seeking monetary damages, and declaratory and injunctive relief, as well as costs and attorneys fees. The Complaint asserts claims under: (i) the Copyright Act of 1976 ("Copyright Act"), 17 U.S.C. §§ 502, 504, 505, and several foreign copyright statutes, alleging copyright infringement; (ii) the Declaratory Judgment Act, 28 U.S.C. §§ 2201, for a declaration of sole copyright ownership; (iii) the Lanham Act, section 43(a), 15 U.S.C. § 1125(a), alleging

false designation of origin; (iv) the Sherman Act, 15 U.S.C. § 1, and the Clayton Act, 15 U.S.C. § 15, alleging anti-trust violations; and (v) the Copyright Act and New York common law for an accounting of profits by a co-owner, in the event that plaintiff is precluded from asserting independent copyright ownership.

On December 1, 1999, the instant motion to dismiss was filed by defendants Shubert, RUG, RUT, RUF, RUH, The Cats Company, Flummery Corporation, Schoenfeld, and Webber. They move to dismiss the action in its entirety pursuant to Rule 12(b)(6) and as against RUT, RUF and RUH pursuant to Rule 12(b)(2). Defendants also specifically allege that plaintiff's claims against Schoenfeld and Webber should be dismissed under Rule 12(b)(6), because plaintiffs have failed to identify any actionable conduct by these defendants. (Def.'s Mem. Law at 37–39.) On January 10, 2000, the Court heard oral argument on the motion. Pursuant to a stipulation of the parties dated February 28, 2000, the following defendants joined the pending motion: Napier; Mackintosh; Cameron Mackintosh, Inc.; Nina Lannan Associates, Inc.; Polygram NV; Polygram Records; Inc.; and Universal Music Group, Inc. (Stipulation dated February 28, 2000.) Defendant Geffen joined the pending motion by stipulation of the parties dated May 2, 2000. (Stipulation dated May 2, 2000.) [5]

### DISCUSSION

### I. Legal Standard Governing Motion to Dismiss

Under Rule 12(b)(6), the Court may dismiss an action when the complaint fails to state a claim on which relief can be granted. Dismissal is inappropriate, however, unless "it appears beyond doubt that the

plaintiff can prove no set of facts in support of the claim which would entitle him to relief." *Staron v. McDonald's Corp.*, 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In deciding a motion to dismiss, the Court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's factual allegations as true. *See Branham v. Meachum*, 77 F.3d 626, 628 (2d Cir.1996); *Staron, supra*, 51 F.3d at 355. The Court's function is not to weigh the evidence that might be presented at trial but merely to determine whether the Complaint itself is legally sufficient. *See Festa v. Local 3 Int'l Brotherhood of Electrical Workers*, 905 F.2d 35, 37 (2d Cir.1990)

### II. Plaintiff's Copyright Claims

Plaintiff's first, second, and fifth causes of action are copyright claims. The first cause of action, brought pursuant to the Copyright Act, 17 U.S.C. §§ 502, 504, 505, alleges that defendants infringed plaintiff's copyright in the Makeup Designs during the three-year period prior to the filing of the instant action. (Compl.¶ 185.) The second cause of action, brought pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, seeks a declaration that plaintiff is the sole owner of the copyright in the Makeup Designs, and "has the unfettered right to exploit them commercially or otherwise in any medium, as well as the right to receive damages and injunctive relief." (*Id.* ¶ 192.) Plaintiff's fifth cause of action alternatively seeks an accounting for profits as a co-owner,[6] pursuant to the Copyright Act, and New York common law. Moreover, in addition to her claims brought under the U.S. Copyright Act, plaintiff brings infringement claims under several foreign copyright statutes. (*Id.* ¶¶ 25, 181.)

---

**5.** All defendants except Polygram Video have joined the motion. These defendants are hereinafter referred to as "defendants."

**6.** A claim for accounting is a remedy premised on a determination of co-ownership be-

cause the duty to account for profits "presupposes a relationship as co-owners of the copyright." *Weber v. Geffen Records*, 63 F.Supp.2d 458, 464 (S.D.N.Y.1999).

## A. Ownership Claims

### 1. Elements of Ownership

Because the issue of ownership, as raised by the parties, is integral to assessing the sufficiency of plaintiff's infringement claims, we will first address plaintiff's claims for sole ownership and, in the alternative, for an accounting based on co-ownership.

In order for a work to be copyrightable, it must be "an original work of authorship"; that is, it must be (i) original and (ii) fixed in a tangible form. 17 U.S.C. § 102(a). Copyright protection for an original work does not extend to "any idea, procedure, process, system, method of operation, concept, principle, or discovery." 17 U.S.C. § 102(b).

The Copyright Act provides that ownership "vests initially in the author or authors of the work." *Id.* The author of a work is the person "who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) (citing 17 U.S.C. § 102). An individual claiming to be an author for copyright purposes must show "the existence of those facts of originality, of intellectual production, of thought, and conception." *Feist Publications, Inc. v. Rural Telephone Serv. Co., Inc.*, 499 U.S. 340, 346–347, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) (quoting *Burrow–Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 59–60, 4 S.Ct. 279, 28 L.Ed. 349 (1884)).

### 2. Parties' Disagreement On Ownership

There is no disagreement between the parties that the Makeup Designs are copyrightable, or that the creator of such Designs is entitled to protection even if he or she does not apply the makeup to the show's performers. The Designs contain the requisite degree of originality, and are fixed in tangible form on the faces of the *Cats* actors. *Cf. Andrien v. Southern Ocean County Chamber of Commerce*, 927 F.2d 132, 135 (3d Cir.1991) (finding that "a party can be considered an author when his or her expression of an idea is transposed by mechanical or rote transcription into tangible form under the authority of the party"); *Lakedreams v. Taylor*, 932 F.2d 1103, 1108 (5th Cir.1991) (noting that authors may be entitled to copyright protection even if they do not "perform with their own hands the mechanical tasks of putting the material into the form distributed to the public"); (Ex. A to Jobin Aff.) (letter from the Copyright Office stating that "any copyright claim would have to be in creating the designs").

■ However, the parties disagree on the implications of plaintiff's registration of the Makeup Designs with the Copyright Office on the ownership of the Designs. While defendants acknowledge that each of the Designs can be individually authored, and, by implication, are individually copyrightable, they appear to deny that plaintiff can assert copyright ownership as to individual Designs because plaintiff registered them as "one work." (Def.'s Mem. Law at 16.) The Court finds defendants' position untenable. Section 408(c)(1) of the Copyright Act permits single registration for a group of "related works." 17 U.S.C. § 408(c)(1); *see also Xoom, Inc. v. Imageline, Inc.*, No. Civ. A. 3:98CV00542, 1999 WL 1611444, at *1 (E.D.Va. Sept. 3, 1999) (defining "group registration" as "a single registration that actually covers multiple works"); (Tr. at 57: 15–19.) That section of the Act also states that the "administrative classification of works has no significance with respect to the subject matter of copyright or the exclusive rights provided by this title." *Id.*[7] Simply be-

---

7. The legislative history of the Act indicates that allowing related works to be registered together was designed to avoid cases where "the technical necessity for separate application and fees has caused copyright owners to forego copyright altogether." H.R.Rep. No.

cause certain designs are registered as a group does not prevent the alleged owner from bringing a claim for infringement as to individual designs. *See Yurman Design, Inc. v. PAJ, Inc.*, 93 F.Supp.2d 449, 456–59 (S.D.N.Y.2000) (finding that jury could reasonably find infringement of certain individual jewelry designs within a group of designs registered under a single copyright, and that infringement of an individual design would still be possible even if the designs had improperly been registered as a group); *Brown v. McCormick*, 23 F.Supp.2d 594, 610 (D.Md.1998) (holding that designer of 15 quilt block patterns registered as a single copyright could sue for infringement with respect to any of the individual designs). In this case, because the Makeup Designs do not constitute a single work, it is *a priori* possible that the copyright in each of the Designs could be owned individually by plaintiff or Napier (and his assigns), or jointly where each is also a co-author.

While the parties appear to agree on the facts surrounding the creation of the Makeup Designs, they disagree on the specifics of authorship and, consequently, the ownership of the Designs. Each side has made seemingly inconsistent claims. While plaintiff acknowledges that she worked "[i]n collaboration with [defendant] Napier," she maintains that she created certain "design elements and entire designs." (Pl.'s Mem. Law at 9.) She states that in her 1990 copyright registration, she claimed ownership to all 28 of the Designs at issue, and that this was not erroneous. But in 1993, her attorney, Jacobsen, "revised his legal opinion as to *some* of the designs." (*Id.* at 10, 23; Compl. ¶ 87.) In particular, Jacobsen claimed that plaintiff was the sole author of 10 of the Designs, that 15 were co-authored with Napier, and 3 were authored solely by Napier. (Pl.'s Mem. Law at 11; Compl. ¶ 87). Plaintiff asserts that she is not bound by Jacobsen's

opinions. (Pl.'s Mem. Law at 23). While plaintiff's allegations are far from a model of clarity, it is clear that she claims sole authorship, and thereby sole ownership, of some or all of the Makeup Designs. She has consistently maintained that at least 10 of the Makeup Designs are solely hers. (*Id.* at 11, 24; Compl. ¶¶ 86–87; Jobin Aff. ¶ 4.) Defendants acknowledge that plaintiff created a certain number of the Designs, and specifically refer to Jacobsen's findings as to the respective authorship of plaintiff and Napier. (Def.'s Mem. Law at 16–17.) However, they assert that they have "consistently and unequivocally treated all 'Cats' copyrights as their own." (*Id.* at 5.) In this motion, they challenge both of plaintiff's ownership claims as time-barred, and her sole ownership claim on the basis that the Makeup Designs are a "joint work" authored by plaintiff and Napier. (*Id.* at 7–11, 15–18.) Because the Court finds that plaintiff's ownership claims are barred by the statute of limitations, it need not consider the joint work argument here.[8]

### 3. Plaintiff's Ownership Claims are Time–Barred

■ Pursuant to section 507(b) of the Copyright Act, a plaintiff seeking a declaration of copyright co-ownership must commence an action within three years of the accrual of the claim. *See Merchant v. Levy*, 92 F.3d 51, 56 (2d Cir.1996). Courts in this district have extended this rule to parties seeking a declaration of sole ownership. *See, e.g., Minder Music Ltd. v. Mellow Smoke Music Co.*, No. 98 Civ. 4496(AGS), 1999 WL 82075, at *2 (S.D.N.Y. Oct. 14, 1999) (applying the three-year limitations period to plaintiff's assertion of sole ownership); *Aday v. Sony Music Entertainment, Inc.*, No. 96 Civ. 0991, 1997 WL 598410, at *3–5 (S.D.N.Y. Sept. 25, 1997) (same); *Fort Knox Music, Inc. v. Baptiste*, 47 F.Supp.2d 481, 483–84

---

94–1476, at 154 (1976), U.S.Code Cong. & Admin.News 1976, 5659.

8. Defendants' "joint work" argument is considered with respect to plaintiff's infringement claims, *infra*.

(S.D.N.Y.1999), *remanded on other grounds* (applying the three-year limitations period in declaratory judgment action to bar defendant songwriter from asserting sole ownership). Copyright claims begin to accrue, when the plaintiff "knows or should have known of the injury on which the claim is premised." *Merchant, supra,* 92 F.3d at 56.

In this case, it is clear from the facts alleged in the Complaint that plaintiff's sole ownership and accounting claims, which both involve a declaration of ownership rights, accrued more than three years prior to the commencement of the action. Although plaintiff contends that defendants appeared to recognize her "proprietary interest" in the Makeup Designs before 1992, (Compl.¶¶ 11–12), she has never received royalty payments from defendants for use of her copyrights. (*Id.* ¶ 49; Def.'s Mem. Law at 5.) Thus, although defendants did not directly acknowledge their repudiation of plaintiff's rights during the 1980s, their non-payment of royalties should have put her on notice of this fact. (Def.'s Mem. Law at 5.); *cf. Dewan v. Blue Man Group Ltd. Partnership,* 73 F.Supp.2d 382, 386–87 (S.D.N.Y.1999) (finding that non-payment of royalties was one element triggering accrual of claim in a suit for a declaration of co-ownership).

Even if the non-payment of royalties were not sufficient to put plaintiff on notice as to her ownership claims, the claims accrued in 1992 based on defendants' clear assertion of ownership and their repudiation of plaintiff's claims to both sole and co-ownership. In January 1992, plaintiff sent a letter to defendants asserting copyright ownership of the Makeup Designs and demanding that defendants seek a license from plaintiff in order to continue their theretofore illegal use of the Designs. (Compl.¶ 91); *see Fort Knox, supra,* 47

F.Supp.2d at 483–84 (holding that sole ownership claim accrued when putative sole owner first attempted to assert sole ownership); *Dewan, supra,* 73 F.Supp.2d at 386–87 (holding that co-ownership claim accrued when plaintiff first attempted to have defendants recognize his ownership interest). Instead of complying with plaintiff's request, defendants asserted ownership of the copyrights in the Designs in their July 30, 1992 letter, in which they warned plaintiff that her use of the Designs to produce, *inter alia,* a *Cats* coloring book would constitute a "willful infringement." (Compl.¶¶ 92–93.) In March 1993, Napier refused to allow plaintiff to add his name to plaintiff's copyright registration, and Napier, Shubert and RUG petitioned the Copyright Office to cancel plaintiff's registration of the Designs. In the petition, Napier asserted *inter alia* that "the designs of the facial appearances ... were my creation and not those of [plaintiff]". (*Id.* ¶ 108.) Further, in July 1993, Napier and RUG themselves registered a copyright adverse to that of the plaintiff. (*Id.* ¶ 129.); *cf. Aday, supra,* 1997 WL 598410 at *4–5 (holding that sole ownership claim accrued when defendants first asserted ownership by entering into contract with plaintiff in which a work-for-hire clause granted sole ownership of the copyrights to defendants). Plaintiff subsequently engaged in significant correspondence with the Copyright Office concerning defendants' cancellation proceedings. (Compl.¶¶ 114–116, 122).

Accordingly, at the latest, plaintiff was afforded notice of the facts giving rise to her ownership claims by July 1993. Because these claims accrued approximately six years prior to the commencement of the action, plaintiff's ownership claims are barred by the statute of limitations.[9] (Tr. at 38:21–25.)

---

9. The Court notes that plaintiff's claim for accounting is asserted under state as well as federal law. Section 301 of the Copyright Act expressly preempts state law claims that are equivalent to claims "falling within the scope" of the Copyright Act, including a state law claim for an accounting. *See Richard Feiner & Co., Inc. v. H.R. Indus., Inc.,* 10 F.Supp.2d 310, 316 (S.D.N.Y.1998). The Court therefore dismisses plaintiff's claim for

#### 4. The Statute of Limitations Cannot Be Tolled

Contrary to plaintiff's suggestion, neither equitable tolling nor equitable estoppel will toll the statute of limitations on her copyright ownership claims in order to cure her delay in filing. (Pl.'s Mem. Law at 2–3, 5–6, 17 n. 13; Compl. ¶¶ 68, 84–89, 157, 161.) Equitable tolling tolls the statute where a plaintiff "was justifiably ignorant of his cause of action." *Netzer,* 963 F.Supp. at 1316 (citing *Dillman v. Combustion Engineering, Inc.,* 784 F.2d 57, 60 (2d Cir.1986)). In this case, the statute of limitations cannot be tolled beyond July 1993, when, as stated above, plaintiff was unequivocally put on notice of her ownership claims by the adverse copyright registration of defendants. This is not sufficient to bring plaintiff's ownership claims within the statute of limitations.

■ Equitable estoppel tolls the limitations period where the plaintiff knew of the existence of the cause of action but the defendants' "egregious misconduct" caused the plaintiff to delay filing suit. *Id.* at 1316 (citing *Buttry v. General Signal Corp.,* 68 F.3d 1488, 1493 (2d Cir.1995)). The doctrine only applies when the defendant "has taken active steps to prevent [the plaintiff] from suing in time, as for example, by promising not to plead the statute of limitations." *Jerry Kubecka, Inc. v. Avellino,* 898 F.Supp. 963, 971 (E.D.N.Y.1995). Plaintiff states that her delay in filing suit after 1992 was due in part to ongoing settlement negotiations with defendants. (Pl.'s Mem. Law at 11; Compl. ¶¶ 23, 91–92, 156, 161.) However, these negotiations do not justify a delay in suit under an equitable estoppel theory, where the years 1992 and after where punctuated by defendants' cease and desist letter, initiation of cancellation proceedings, registration of their own copyright, and alleged communications to potential licensees that plaintiff's exploitation of the

Makeup Designs was illegal. *See Dewan, supra,* 73 F.Supp.2d at 386–87 (finding that several years of settlement negotiations did not warrant a finding of equitable estoppel where there were lapses in contact between the sides and where a "letter from defendants served to place [plaintiff] on notice once again that a suit was necessary"); *Beneficial Capital Corp. v. Richardson,* No. 92 Civ. 3785, 1995 WL 324768, at *5 (S.D.N.Y. May 31, 1995) (denying equitable estoppel where delay was due in part to settlement negotiations). Moreover, defendants' threats of litigation if plaintiff claimed or exploited her alleged copyright would not equitably estop defendants from asserting the statute of limitations. *See Netzer, supra,* 963 F.Supp. at 1318 (finding no equitable estoppel where delay was due to "fear of harm to a plaintiff's career").

### B. Domestic Infringement Claims

#### 1. Plaintiff Has Sufficiently Pleaded An Infringement Cause of Action

■ To withstand a motion to dismiss, a complaint based on copyright infringement must allege: (1) which original works are the subject of the copyright claim; (2) that the plaintiff owns the copyrights in those works; (3) that the copyrights have been registered in accordance with the statute; and (4) "by what acts during what time" the defendant infringed the copyright. *See Kelly v. L.L. Cool J.,* 145 F.R.D. 32, 35 (S.D.N.Y.1992), *aff'd,* 23 F.3d 398 (2d Cir. 1994).

■ The Court finds that plaintiff's Complaint sufficiently pleads a cause of action for copyright infringement. While there is some ambiguity as to her precise ownership claims, plaintiff has specifically identified the 28 makeup Designs as the works at issue, for which she has a valid

---

accounting, insofar as it is asserted under New York law, as pre-empted. *See id.; see also Weber, supra,* 63 F.Supp.2d at 463 (dis-

missing plaintiff's state law claim for accounting as preempted where Copyright Act ownership claim was time-barred).

copyright registration,[10] and has alleged sole ownership to some, if not all, of the Designs. Such pleading is sufficient to establish the first three elements of an infringement claim. *See Kelly, supra,* 145 F.R.D. at 36 & n. 3 (discussing these elements). Further, plaintiff's allegations of infringing acts associated with the publication of the Designs in *Cats* productions and through related products are adequately, albeit inartfully, plead in the Complaint with respect to most defendants.[11] Rule 8 of the Federal Rules of Civil Procedure requires that the particular infringing acts be set out with some specificity, *Franklin Elec. Publishers, Inc.,* 763 F.Supp. 1, 4 (S.D.N.Y.1991), and broad, sweeping allegations of infringement do not comply. *See Hartman v. Hallmark Cards, Inc.,* 639 F.Supp. 816, 820 (W.D.Mo.1986), *aff'd,* 833 F.2d 117 (8th Cir.1987) (plaintiff's allegation that "all other animated productions, paper products, dolls, toys, and any other merchandising and licensing products" of defendant were infringing was too broad under Rule 8). Plaintiff's Complaint narrows the infringing acts to the publication of the Makeup Designs in national and international stage productions and videos, and their illegal use in certain commercial products. (Compl.¶¶ 66–82, 93–103.) These allegations are sufficiently specific for the purposes of Rule 8, despite the fact that each individual infringement was not specified. *Cf. Franklin, supra,* 763 F.Supp. at 4 (stating that complaint complied with Rule 8 in spite of the fact that defendants could not determine whether software elements or visual elements of the computer were claimed to be infringed); *Richard Feiner and Co., Inc. v. Larry Harmon Pictures Corp.,* 38 F.Supp.2d 276, 279 (S.D.N.Y.1999) (finding that plaintiff's failure to specify which copyright is infringed by which act was not fatal to his infringement claim). Therefore, the Complaint satisfactorily pleads a copyright infringement claim.

### 2. Plaintiff's Infringement Claims Cannot Be Dismissed as Time–Barred

Without addressing the sufficiency of plaintiff's domestic infringement claims, defendants assert that they should be dismissed on statute of limitations grounds. They state that the infringement claims are time-barred because "[a]t its heart this matter is a dispute over ownership between plaintiff and the defendants, all of whose rights were originally derived from Napier." (Def.'s Mem. Law at 2.)

Defendants rely heavily on the Second Circuit's decision in *Merchant, supra,* 92 F.3d 51. At issue in *Merchant* was the plaintiffs' request for a declaration of co-ownership rights based on their alleged co-authorship of the well-known musical composition "Why Do Fools Fall in Love." The court reversed the lower court's declaration of co-ownership rights and damages for a time-period beginning three years prior to filing, because the jury had found that plaintiffs were charged with knowledge of their claim in 1961, over 30 years prior to filing. *See id.* at 56. Focusing specifically on co-ownership claims, the court held that "plaintiffs claiming to be co-authors are time-barred three years after accrual of their claim from seeking a declaration of copyright co-ownership rights and any remedies that would flow from such a declaration." *Id.* In so holding, the court explicitly distinguished the application of the three-year statute of limitations as applied to copyright infringement claims. The court stated that "[o]ur holding here does not disturb our previous rulings that a copyright owner's suit for infringement is timely if instituted within

---

**10.** A certificate of registration from the United States Register of Copyrights constitutes prima facie evidence of the valid ownership of a copyright, although that presumption of ownership may be rebutted. *See Rogers v. Koons,* 960 F.2d 301, 306 (2d Cir.1992).

**11.** The Court addresses the sufficiency of the Complaint as to certain of the corporate defendants in its consideration of jurisdiction, *infra.*

three years of each infringing act for which relief is sought ..." *Id.* at 57 n. 8.

The *Merchant* court relied on the Ninth Circuit's decision in *Zuill v. Shanahan,* 80 F.3d 1366 (9th Cir.1996), the final decision of which had been published three weeks earlier, and parallels *Merchant* in several respects. At issue in *Zuill* was plaintiff musicians' request for a declaration of co-ownership rights based on their alleged co-authorship of a well-known program designed to assist children to read. Affirming the lower court's decision to bar the action on statute of limitations grounds, the court held that "claims of co-ownership, as distinct from claims of infringement, accrue when plain and express repudiation of co-ownership is communicated to the claimant, and are barred three years from the time of repudiation." *Id.* at 1369. Finding that "[c]reation, rather than infringement was the gravamen of plaintiffs' ownership claim," the court held that the claim "did not accrue upon subsequent publication" of the work in question. *Id.* at 1371.

As in *Merchant,* the *Zuill* decision barred plaintiffs' ownership claims and the remedies that flowed therefrom. *See id.* at 1371 (barring "a declaratory judgment of co-ownership and the relief ancillary to such a claim"). These remedies include an accounting for profits by a co-owner, which arises from equitable doctrines such as unjust enrichment and general principles of co-ownership. *See id.* at 1369 (citing *Oddo v. Ries,* 743 F.2d 630, 632–33 (9th Cir.1984)); *cf. Merchant, supra,* 92 F.3d

at 51 (noting that plaintiffs also filed a claim for an accounting). However, the court noted that certain rights "can withstand the statute of limitations," and cited to legislative history showing the Congress intended the statute of limitations under the Copyright Act to extend only to remedies, and not to substantive rights. *See id.* at 1369–70.[12] Those substantive rights include, *inter alia,* the right as a copyright owner to sue for infringement, which lasts as long as the copyright itself, namely life of the creator plus fifty years. *See id.* at 1369; 17 U.S.C. § 302(b) (discussing duration of copyright protection). These substantive rights were present in neither *Zuill* nor *Merchant,* where plaintiffs' had only claimed co-ownership, and because, in any event, co-owners cannot be liable to each other for infringement. *See Zuill, supra,* 80 F.3d at 1369. But such rights could be present where a plaintiff sufficiently pleads an infringement cause of action.

■■ The implication of the holdings in *Merchant* and *Zuill* is that while a dismissal of an ownership claim as time-barred bars certain remedies associated with ownership, it does not extinguish the right of a copyright owner to sue for infringement. A copyright owner can recover for infringing actions that occur within three years of filing; only infringement claims beyond three years of suit are barred. *See Zuill, supra,* 80 F.3d at 1370 ("[T]he statute bars recovery on any claim for damages that accrued more than

---

**12.** The pertinent section of the Senate report states: "The committee wishes to emphasize that it is the committee's intention that the statute of limitations, contained in this bill, is to extend to the remedy of the person affected thereby, and not to his substantive rights.... It may be well to point out that statutes of limitations take the form of a limitation upon the substantive right or upon the remedy. Under the former, the right of action is extinguished at the end of the period and the courts usually have no jurisdiction with regard to actions that are not instituted within the appropriate period.... Under the remedial type of statute, the basic right is not

extinguished, but the limitation is applied merely to the remedy.... As far as this committee has been able to ascertain, all State statutes of limitation, which now govern Federal courts in copyright actions, are limitations upon the remedy, and the present bill has been drawn to apply this concept to a uniform Federal period of limitations." S.Rep. No. 85–1014, at 1963 (1957); *see also* H.R.Rep. No. 94–1476 at 283 (1976) (stating that section 507 of the Copyright Act, which was adopted in 1957 and establishes the three-year statute of limitations, "represents a reconciliation of views, and has therefore been left unaltered").

three years before commencement of suit, neither barring infringing acts within the limitations period, nor reaching back to infringements prior to the statutory period."); *cf.* Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 12.05[A] (1999) (stating that where the alleged infringement "occurred within three years prior to filing, the action will not be barred even if prior infringements by the same party as to the same work are barred because they occurred more than three years previously"). Thus, while this Court interprets the holdings of *Merchant* and its progeny to bar plaintiff's sole ownership and co-ownership claims,[13] *see supra*, the Court declines to find that her infringement claims are time-barred as a result. Under the Copyright Act, and the holdings of *Merchant* and *Zuill*, the Court finds that a plaintiff's right to sue as a copyright owner is not a remedy that flows from a declaration of ownership.[14]

■■■ Defendants seek to bring this case within the holding of *Merchant* by referring to cases where the gravamen of plaintiff's copyright claims was ownership. (Def.'s Mem. Law at 8–10; Tr. at 17:25–25, 18:1–10.) In particular, defendants cite to *Zuill*, where, as noted *supra*, "creation" was the gravamen of plaintiff's claim, and to *Minder Music, supra*, 1999 WL 820575, at *2, decided by this Court, where the Court, relying on *Merchant*, found that plaintiff "portray[ed][the] action as one for

infringement when copyright ownership rights [were] the true matter at issue." In *Minder Music*, plaintiff, owner of a 50 percent share in copyrights in certain musical compositions, brought an action asserting that he was owner of the other 50 percent share, and a claim for infringement. *See id.* at *1. Because the plaintiff's sole ownership claim had accrued more than three years prior to filing the action, his infringement claim was also found to be time-barred. *See id.* at *2.

Defendants also cite to *Fort Knox Music v. Baptiste*, 47 F.Supp.2d 481 (S.D.N.Y. 1999), a declaratory judgment action in which the court applied *Merchant* in barring the defendant from bringing a sole ownership claim, where the defendant clearly knew of his claimed injury decades prior to the commencement of the suit. *See id.* at 483–84. In addition, because the Court found that defendant's continued attempts to challenge the plaintiffs' copyright ownership were "patently frivolous," the Court barred defendant from asserting "any action challenging under the Copyright Act the rights of plaintiffs or their successors, assignees, or licensees … upon the ground that Baptiste is the sole author of that composition …" *Id.* at 484–85. While the court's holding could be read to encompass a claim for copyright infringement, the court's decision to bar such a claim was based on the clear invalidity of defendant's assertion of sole ownership, rather than on the operation of the

---

**13.** While *Merchant* and *Zuill* focused on co-ownership claims their holdings have been extended to bar claims for declarations of sole ownership brought more than three years after the accrual of the claim, which the Court has done in this case. *See supra.*

**14.** Sole ownership and infringement claims are often brought together. However, the Court notes the *right* to sue for infringement is not a remedy flowing from a declaration of sole ownership, because the former does not depend on the latter in the way that the remedy of an accounting requires a declaration of co-ownership. The only requirement to institute a suit for infringement is a valid

copyright registration certificate. Nor does a declaration of sole ownership guarantee success on an infringement claim in the way that co-owners are required to provide other co-owners with an accounting. The declaration of sole ownership, as plaintiff points out, is often brought peripherally to an infringement claim, because it provides for the option of an expedited hearing under Fed.R.Civ.P. 57 ("Rule 57"). (Pl.'s Mem. Law at 17–18.) It also serves as an additional mechanism for notice of ownership rights to other potential infringers. Such a declaration's remedies are completely distinct from infringement remedies.

statute of limitations.[15]

The cases cited by defendants are inapplicable here, because plaintiff has sufficiently articulated a cause of action for infringement that is separate and distinct from her ownership claim. The gravamen of plaintiff's copyright claims is infringement, not ownership; it is her principal cause of action and the Complaint focuses primarily on instances of infringement. (Compl. ¶¶ 1, 181–85; Pl.'s Mem. Law at 4, 14 n. 14.) In this respect, the instant case is clearly distinguishable from *Minder Music*. Because the plaintiff in *Minder Music* was an acknowledged co-owner, his infringement action depended on a successful declaration of sole ownership. The ownership claim was therefore the critical element of the case, and the Court reasoned that because that claim was barred, the infringement claim was also barred. *Id.* at *2. Here, on the other hand, plaintiff's infringement claim is separate and distinct from the adjudication of her ownership claims. Plaintiff's ownership claims were brought as separate mechanisms for declaratory relief: her sole ownership claim was brought in response to threats of litigation by defendants to reserve the possibility of an expedited hearing under Rule 57 (Pl.'s Mem. Law at 17–18); her claim for an accounting, the co-ownership claim, was brought in the alternative to the infringement and sole ownership claims, in order to safeguard plaintiff's right to royalty payments if defendants' succeeded on their joint authorship defense. (*Id.* at 17; Compl. ¶¶ 205–07.) Plaintiff's infringement claim is not dependent upon either of these claims. Barring plaintiff's claims requesting a declaration of copyright ownership cannot preclude her from suing for infringement.

The instant case is more similar to *Maurizio v. Goldsmith*, 84 F.Supp.2d 455 (S.D.N.Y.2000). In that case, the plaintiff filed copyright infringement, co-authorship and accounting claims, arising out of the plaintiff's individual contributions to the novel *The First Wives Club*, which later served as the basis for a motion picture of the same title. As in this case, the dispute centered on the rights of two individuals who contributed to a project (i.e. the composition of a novel) that one party had seen to fruition and, eventually, reaped considerable profits. *See id.* at 458–60. Ruling on the defendant's motion for summary judgment, the court applied *Merchant* in finding that the plaintiff's ownership claims were time-barred. *See id.* at 463–64. However, the Court refused to recast the plaintiff's infringement claims as one for ownership, and found that the plaintiff,

---

**15.** Defendants also seek support from *Netzer, supra*, 963 F.Supp. at 1315–16, *Weber, supra*, 63 F.Supp.2d at 464–67, and *Margo v. Weiss*, No. 96 Civ. 3842, 1998 WL 2558, at *5–6 (S.D.N.Y. Jan. 5, 1998), *aff'd*, 213 F.3d 55, 59–61 (2d Cir.). (Def.'s Mem. Law at 8, 10.) In each case, the court barred co-ownership claims on statute of limitations grounds, where plaintiff's claims accrued more than three years prior to filing the action. These cases are inapposite to the instant case on the infringement issue, because their holdings treated only co-ownership claims. While the plaintiff in *Netzer* had brought an infringement claim, he conceded in deposition testimony that his claims were really for co-authorship and co-ownership. *See Netzer, supra*, 963 F.Supp. at 1315. In *Weber*, where infringement was not alleged, the court found that any copyright claim plaintiff brought was time-barred, not because of the *Merchant* holding, but because no infringing acts had occurred within three years prior to suit. *See Weber, supra*, 63 F.Supp.2d at 467.

In *Margo*, which dealt strictly with co-authorship and co-ownership claims, the district court stated that under *Merchant*, "[f]ailure to sue [for a declaration of co-authorship] within the three-year period requires dismissal of a claim of copyright ownership and '*any rights or remedies*' that would flow from such a claim." *Margo, supra*, 1998 WL 2558, at *5. As discussed *supra*, *Merchant* specifically stated that additional *remedies* would be barred, and did not speak to substantive *rights*. *See Merchant, supra*, 92 F.3d at 56. In affirming the district court's decision, the Second Circuit did not discuss the reach of the *Merchant* holding, stating only that "*Merchant* held that plaintiffs were ... time-barred from seeking a declaration of copyright co-ownership rights once the three-year statute of limitations set forth in 17 U.S.C. § 507(b) had run." *Margo, supra*, 213 F.3d 55, 60–61.

by sufficiently alleging her individual authorship of draft chapters of the book, and copying by the defendant, had stated a prima facie case of infringement. *See id.* at 468. Citing *Merchant,* the court declined to dismiss plaintiff's infringement claims for acts of infringement occurring within three years of the filing of the action. *See id.* at 463, 467–68.

The Court denies the motion to dismiss plaintiff's copyright infringement claims for alleged acts of infringement occurring after July 12, 1996, three years before the filing of the present suit. As in *Maurizio,* and unlike the infringement claimants in *Minder Music* and *Fort Knox,* plaintiff has alleged an infringement claim sufficient to defeat defendants' motion. Plaintiff's alleged ownership interest may therefore serve as the basis for plaintiff's infringement claims even if plaintiff is barred from seeking a formal declaration of ownership rights.

Defendants argue that the holdings of, *inter alia, Minder Music* and *Fort Knox* must be deemed to apply here, because the Second Circuit "was not so simple-minded as to create a rule that a plaintiff, merely by asking for infringement remedies other than or in addition to a declaratory judgment, could rescue an otherwise time-barred claim from the statute of limitations." (Reply Memorandum in Further Support of Defendants' Motion to Dismiss ("Def.'s Rep.") at 2–3). The Court agrees with defendants that *Merchant* should not be construed as allowing plaintiffs to make an "end-run" around the statutory mandate of the Copyright Act. In fact, the decisions in *Minder Music* and *Fort Knox* demonstrate that the courts of this Circuit have not construed *Merchant* in this manner. In those cases, the courts recognized that the gravamen of the plaintiffs' claims was ownership, rather than infringement. Under *Merchant* and its progeny, a cause of action for infringement may survive a motion to dismiss only where, in cases similar to the instant one, the plaintiff has a clear right to assert it as a claim separate from the claim of ownership. Contrary to defendants' suggestion, allowing infringement claims to stand here would not defeat the "principles of repose integral to a properly functioning copyright market," *Netzer, supra,* 963 F.Supp. at 1315, because, while inaction on an ownership claim may lull defendants into a false sense of security, a plaintiff's copyright registration and a defendant's own infringing acts over a three-year period are sufficient to place the defendant on notice of a possible infringement claim. Neither does this decision undermine the stated goal of the Copyright Act to enhance "the predictability and certainty of copyright ownership." *Reid, supra,* 490 U.S. at 749, 109 S.Ct. 2166. The record reflects that plaintiff, Napier, or both, are the owners of the copyrights in the Makeup Designs, and this Court's further proceedings will focus on the specific parameters of that ownership in deciding the infringement question. The public interest would be compromised by a decision that precludes a purported sole owner from suing for infringement within the life of her copyright, and that interest is therefore enhanced by preservation of this important right.

### 3. The Makeup Designs, As a Group, Do Not Constitute a Joint Work

Defendants also assert that plaintiff's infringement claim should be barred on the ground that plaintiff and Napier were co-authors, and the Makeup Designs constitute a single joint work. (Def.'s Mem. Law at 15–18.) In particular, defendants contend that because "the facts pleaded ... show that defendant John Napier [from whom all defendants' derive their rights] was at least the co-author of [and, therefore, co-owner of the copyright in] the Makeup Designs," plaintiff's infringement claims must be dismissed. (*Id.* at 15.) However, while it is true that an infringement action will not lie between co-owners because an individual may not infringe his own copyright, *see Netzer, supra,* 868 F.2d at 1318, the record does not

support the conclusion that plaintiff and Napier were co-authors of the Makeup Designs as a group.[16]

■ A "joint work" under the Copyright Act is one "prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. The authors of a joint work are "co-authors" or "joint authors," and if no assignments have been made, "co-owners." The Second Circuit has established a two-part test for joint authorship, whereby each putative co-author must have (1) fully intended, at the time of creation, to be a co-author, and (2) made independently copyrightable contributions to the work. *See Thomson v. Larson*, 147 F.3d 195, 200 (2d Cir.1998) (citing *Childress v. Taylor*, 945 F.2d 500, 507–508 (2d Cir.1991)).

■ Viewing the Complaint in the light most favorable to plaintiff, the Court finds that defendants' claim to joint authorship cannot preclude plaintiff's assertions of her infringement claim. We first note that defendants' reference to the Makeup Designs as a single work is misguided. As noted *supra*, the mere fact that the 28 Designs were incorporated into a single registration does not automatically make them a single work for copyright purposes. (Def.'s Mem. Law at 16; Def.'s Rep. at 8.) In the absence of a joint work, the fact that one party contributes to certain designs, but not to others, does not mean that the party is a co-author of the entire set of designs. Thus, even if plaintiff acknowledged Napier's co-authorship of some of the Designs, this does not preclude her from bringing an infringement

action to enforce her rights to those Designs that she claims she individually owns.

With regard to the intent prong of the analysis, "[a]n important indicator of authorship is a contributor's decisionmaking authority over what changes are made and what is included in a work." *Thomson, supra*, 147 F.3d at 202–03 (citing *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1071–72 (7th Cir.1994) (holding that an actor's suggestions of text did not support a claim of co-authorship where the sole author determined whether and where such suggestions were included in the work)). There is no indication in the Complaint that either plaintiff or Napier intended their "collaboration," (Compl.¶¶ 37, 116), to be inseparable parts of a unitary whole. Rather, plaintiff's allegations support her control over the production of at least some of the Designs, with Napier contributing certain ideas and concepts to those Designs. (*Id.* ¶¶ 40–45, 65.) Defendants point to Jacobsen's unsuccessful effort in 1993 to amend plaintiff's copyright registration as a reflection of co-authorship by Napier of the Designs. (*Id.* ¶ 87; Def.'s Mem. Law at 16–17.) However, the actions of plaintiff's attorney more than a decade after creation indicate nothing about plaintiff's intent at the time of creation. Moreover, even if Jacobsen's actions were indicative of plaintiff's intent, at most they support joint authorship of 15 of the Designs. (Compl. ¶ 87; Jobin Aff. ¶ 4.) A finding of joint authorship to such Designs does not invalidate plaintiff's copyright infringement claim.

Because defendants cannot satisfy the intent prong required to establish a joint work, the Court need not consider the copyrightability prong.[17]

16. The Court notes that defendants' allegations of joint authorship of the Designs are contradicted by other elements referred to in the record, namely: (i) defendants' alleged repudiation of co-authorship and co-ownership in 1993 (Compl. ¶¶ 87, 120, 126; Pl.'s Mem. Law at 11; Tr. at 34:8–9); (ii) Napier and RUG's 1993 copyright registration, and Napier's subsequent petition, in which Napier

allegedly claimed to be sole author of the Designs (Compl. ¶ 129; Ex. A to Jobin Aff.); (iii) defendants' 1992 letter to plaintiff threatening her with "willful infringement" (Compl.¶¶ 92–93); and (iv) defendants' 1995 warning to plaintiff not to claim authorship (Compl. ¶¶ 10 n. 1, 94.).

17. The Court notes, however, that the Complaint raises doubts as to the copyrightability

## C. Foreign Infringement Claims

■ Plaintiff asserts her copyright infringement claims not only pursuant to U.S. law but also pursuant to several foreign copyright statutes, specifically those of Australia, Canada, Japan, and the United Kingdom, and pursuant to the Berne Convention for the Protection of Literary and Artistic Works ("Berne Convention"), Sept. 9, 1886, 25 U.S.T. 1341, and the Universal Copyright Convention ("UCC"), Sept. 6, 1952, 6 U.S.T. 2732. (Compl. ¶¶ 25, 181; Pl.'s Mem. Law at 25 & n. 22.)

Plaintiff's Complaint and motion papers are unclear as to whether plaintiff premises her claims upon violations of copyrights she claims to possess in other countries, or whether her claims are premised upon the infringement, under the laws of other nations, of her alleged U.S. copyright. However, the Court finds that, regardless of this ambiguity, to the extent that plaintiff alleges that some or all of the defendants in this action committed violations of foreign copyright laws, dismissal is not appropriate at this time.

Defendants argue that plaintiff's foreign copyright claims are time-barred because her domestic copyright infringement claims are time-barred. (Def.'s Rep. at 10.) This argument is clearly unavailing in light of the Court's conclusion that plaintiff's domestic infringement claims have been adequately pleaded. The question therefore is whether, if any of the defendants committed acts of infringement abroad that violate foreign copyright laws, this Court may exercise subject matter jurisdiction over these claims. *See Mayor of City of Philadelphia v. Educational Equality League,* 415 U.S. 605, 627, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974) (noting that subject matter jurisdiction can be raised by the court "sua sponte any at stage"); *Manway Constr. Co. v. Hous.*

*Auth. of Hartford,* 711 F.2d 501, 503 (2d Cir.1983) ("It is common ground that in our federal system of limited jurisdiction any party or the court sua sponte, at any stage of the proceedings, may raise the question of whether the court has subject matter jurisdiction.").

Several courts and authorities support the exercise of jurisdiction over foreign copyright infringement claims. In *Armstrong v. Virgin Records,* 91 F.Supp.2d 628 (S.D.N.Y.2000), recently decided in this district, plaintiff, a jazz musician, claimed *inter alia* that defendants violated his copyright in a song recorded by the music group Massive Attack in the United Kingdom, and which was thereafter distributed worldwide. *See id.* at 630–31. He filed claims for copyright infringement under the Copyright Act and under unspecified international copyright laws. *See id.* at 631. The court held that it could entertain plaintiff's claims under international copyright laws on the basis of diversity jurisdiction, and, potentially, on the basis of pendent subject matter jurisdiction to plaintiff's domestic infringement claims. *See id.* at 637–38. Other authorities, while acknowledging that extraterritorial jurisdiction under the Copyright Act is prohibited, *cf. id.* at 634 (finding no extra-territorial application of the Copyright Act where allegedly infringing events entirely took place overseas; *Subafilms, Ltd. v. MGM–Pathe Communications Co.,* 24 F.3d 1088, 1098 (9th Cir.1994) (same)), have asserted that there may be a basis for jurisdiction in cases similar to the instant matter. As Professor Nimmer has explained:

> Even if the United States Copyright Act is clearly inoperative with respect to acts occurring outside of its jurisdiction, it does not necessarily follow that American courts are without [subject matter]

of Napier's contributions to certain of the Designs. In particular, as noted *supra,* only tangible forms of expression are protected by the Copyright Act. "Ideas, refinements, and suggestions, standing alone, are not the subjects of copyrights." *Erickson, supra,* 13 F.3d

at 1072. The Complaint states that with regard to certain Designs, Napier offered "verbal concepts" and suggestions, and plaintiff "gave these sketchy ideas full expression." (Compl.¶¶ 41–42.) Such ideas and suggestions, standing alone, are not copyrightable.

jurisdiction in such a case. If the plaintiff has a valid cause of action under the copyright laws of a foreign country, and if personal jurisdiction of the defendant can be obtained in an American court, it is arguable that an action may be brought in such court for infringement of a foreign copyright law. This would be on a theory that copyright infringement constitutes a transitory cause of action, and hence, may be adjudicated in the courts of a sovereign other than the one in which the cause of action arose.

*Armstrong, supra,* 91 F.Supp.2d at 637 (quoting 3 Nimmer, *supra.,* § 17.03); *see also* 3 Paul Goldstein, Copyright, § 16.2 at 16:8–16:9 (2000) ("Subject to jurisdictional requirements, a copyright owner may sue an infringer in United States courts even though the only alleged infringement occurred in another country.")

Decisions of other courts in this Circuit support the conclusions of these authorities and the decision reached by the *Armstrong* court. *See London Film Prods. v. Intercontinental Comm.,* 580 F.Supp. 47, 49–50 (S.D.N.Y.1984) (refusing·to dismiss a claim by a British corporation against a New York corporation for violation of British copyright law); *see also Frink America, Inc. v. Champion Road Machinery, Ltd.,* 961 F.Supp. 398, 404 (N.D.N.Y.1997) (refusing to dismiss claim against U.S. corporation for Canadian copyright infringement, citing *London Film*); *cf. Bridgeman Art Library, Ltd. v. Corel Corp.,* 25

F.Supp.2d 421, 430 (S.D.N.Y.1998) (dismissing foreign copyright claims, in part because no diversity jurisdiction was present).[18]

Therefore, at this stage in the proceedings, there is no reason to believe that the Court would be foreclosed from applying foreign law to plaintiff's foreign infringement claims. Plaintiff has alleged the violation of specific foreign copyright laws, (Compl.¶¶ 25, 181), and the record reflects that diversity jurisdiction may be applicable to several of the defendants.[19] (*Id.* ¶¶ 162–180.) Moreover, pendent jurisdiction may enable the Court to assert jurisdiction over the other defendants. *See Armstrong, supra,* 91 F.Supp.2d at 637. The Court therefore accepts subject matter jurisdiction over these claims at this time.

■ Plaintiff's assertion of claims for copyright violations under the Berne Convention and UCC are, however, improper. (Compl.¶ 181). Under both conventions, an author who is a national of a signatory country, or one who first publishes his work in any such country, is entitled to the same copyright protection in another signatory country as that latter country accords to its own nationals. *See* Berne Convention Art. V; UCC Art. II;[20] *Itar-Tass Russian News Agency v. Russian Kurier, Inc.,* 153 F.3d 82, 89 (2d Cir.1998); 4 Nimmer, *supra,* § 17.05. This principle, called "national treatment," provides that the law of signatory countries that applies

**18.** The important consideration of whether a U.S. court is the proper forum to assert these claims is an issue that is not currently before the Court. *See Armstrong, supra,* 91 F.Supp.2d at 638.

**19.** Plaintiff claims that the list of foreign copyright violations alleged in the Complaint is non-exhaustive. (Pl.'s Mem. Law at 25 n. 22.) The fact that plaintiff has not provided defendants with an exhaustive list is not grounds for dismissal. However, plaintiff will need to avail defendants of this information during the discovery process. Moreover, until information as to all of plaintiff's foreign claims has been provided, the Court declines to address choice of law.

**20.** The Berne Convention was drawn up by ten nations in 1886. The UCC was created in 1952 under the auspices of the United Nations (UNESCO) to provide an alternative to the Berne Convention that would not require the signatories, in particular the United States, to forfeit their copyright notice requirements. *See* Nimmer, *supra,* § 17.01[B][1] at 17–5 to 17–6. The central purpose of both treaties is to dispense with formalities as a condition to copyright protection, and the UCC explicitly grants priority to the Berne Convention with respect to relations between two members of the Berne Convention. *See id.* at 17–10.1, 17–11.

to the scope of substantive copyright protection, "will be applied uniformly to foreign and domestic authors." *Itar–Tass, supra,* 153 F.3d at 89–90 (citing *Murray v. British Broadcasting Corp.,* 906 F.Supp. 858 (S.D.N.Y.1995), *aff'd* 81 F.3d 287 (2d Cir.1996)). However, neither the Berne Convention nor the UCC are self-executing treaties, and the Berne Convention Implementation Act of 1988, Pub.L. 100–568, 102 Stat. 2853, 17 U.S.C. § 101 note, provides *inter alia* that the provisions of the Convention "shall not be enforceable in any action brought pursuant to the provisions of the Berne Convention itself." *Itar–Tass, supra,* 153 F.3d at 90. Accordingly, while the provisions of the two conventions may provide support for the decision of a U.S. court to hear claims brought under foreign copyright laws, and may be important to decisions regarding choice of law, these conventions do not offer an independent jurisdictional basis for suit in U.S. federal court.

## III. Lanham Act Claim

Plaintiff's third claim is asserted pursuant to section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which prohibits, *inter alia,* misrepresentation likely to cause confusion about the source of a product. In particular, plaintiff alleges that certain defendants' misrepresentations concerning authorship of the Makeup Designs and their concomitant failure to credit plaintiff with authorship was a "false designation of origin" in violation of section 43(a). (Compl.¶ 196.)

Section 43(a)(1)(A) of the Lanham Act prohibits any misrepresentation, in interstate commerce, likely to cause confusion about the source or the manufacturer of a product. 15 U.S.C. § 1125(a)(1)(A); *Waldman Publ'g Corp. v. Landoll, Inc.,* 43 F.3d 775, 780 (2d Cir.1994). This section forbids not only "passing off," in which A promotes A's products under B's name, but also "reverse passing off," in which A promotes B's products under A's name. *See Waldman Publ'g, supra,* 43 F.3d at

780. Plaintiff's section 43(a) claim falls into the latter category, because she alleges that defendants are engaged in passing off plaintiff's goods as their own. *Cf. Margo, supra,* 1998 WL 2558, at *9 (analyzing as reverse passing off claim songwriter's allegations of failure to provide ownership credit); *Netzer,* 963 F.Supp. at 1323 (describing same in the context of alleged misattribution of comic book character). The harm caused by reverse passing off is that the originator of the product is "involuntarily deprived of the advertising value of its name and of the goodwill that otherwise would stem from public knowledge of the true source of the satisfactory product." *Rosenfeld v. W.B. Saunders, Division of Harcourt Brace Jovanovich, Inc.,* 728 F.Supp. 236, 241 (S.D.N.Y.), *aff'd,* 923 F.2d 845 (2d Cir.1990). A successful "reverse passing off" claim requires that the plaintiff establish (i) that the work at issue originated with the plaintiff; (ii) that origin of the work was falsely designated by the defendant; (iii) that the false designation of origin was likely to cause consumer confusion; and (iv) that the plaintiff was harmed by the defendant's false designation of origin. *See Waldman Publ'g, supra,* 43 F.3d at 781–85.

In the Complaint, plaintiff alleges that she is the owner of the copyrights in the Makeup Designs, and that: (i) the copyright registration of Napier and RUG falsely implies that Napier is the creator of the Designs; (ii) the makeup credit on the allegedly infringing *Cats* video omits plaintiff's name and instead gives credit to another makeup designer, "Karen Dawson–Harding"; (iii) the "Face Painting Set" fails to credit plaintiff for the Designs; (iv) playbills for certain infringing productions have either omitted plaintiff's name and/or credited others for the Designs; and (v) after the Copyright Office's referral of the dispute to the courts, The Cats Company circulated press releases claiming that Napier designed the makeup and omitting mention of plaintiff. (Compl.¶ 196.) Plaintiff also alleges that these violations

are likely to cause consumer confusion, and that she has been harmed by defendants' activities. (*Id.* ¶¶ 198–200.) Each of defendants' alleged actions potentially affects interstate commerce. *See Conan Properties, Inc. v. Mattel, Inc.*, 601 F.Supp. 1179, 1183 (S.D.N.Y.1984) (stating that it is not necessary to explicitly plead that the goods in question entered interstate commerce; rather, the allegations need only "contain sufficient facts from which an interstate effect can readily be inferred").

■ Defendants assert that plaintiff's claim is barred by the statute of limitations and by the doctrine of laches. Defendants argue that plaintiff's claim is time-barred for two reasons. First, defendants assert that the six-year statute of limitations applicable to New York Lanham Act claims expired prior to the commencement of the instant suit. (Def.'s Mem. Law at 20.) Defendants argue that the alleged violations "first occurred some time in 1985, when ... a different makeup artist was engaged for the National II production of *Cats.*" (*Id.* at 21.) Defendants therefore contend that since plaintiff discovered, or should have discovered, her claim in 1985, her claim is now time-barred. (*Id.*) Second, defendants contend that a Lanham Act claim premised on a time-barred claim of copyright ownership must be dismissed. (Def.'s Rep. at 11.) The Court disagrees with both contentions.

Because the Lanham Act establishes no limitations period for unfair competition claims and there is no corresponding federal statute of limitations, a federal court looks to the most appropriate or analogous statute of limitations. *See Wilson v. Garcia*, 471 U.S. 261, 266–68, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). The Second Circuit has held that the most analogous New York period is the six-year period for fraud claims pursuant to the New York Civil Practice Law and Rules ("CPLR") § 213(8). *See Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191–192 (2d Cir. 1996). Under CPLR § 213(8), a cause of action under the Lanham Act accrues at the time the plaintiff "discovered the fraud, or could with reasonable diligence have discovered it." CPLR § 213(8).

In arguing that the six-year statute of limitations is dispositive here, defendants refer to *Margo, supra,* 1998 WL 2558, *Weber, supra,* 63 F.Supp.2d 458, and *Netzer, supra,* 963 F.Supp. 1308, where the plaintiffs alleged false attribution arising out of the defendants' failure to provide co-authorship credit. In each case, the alleged misrepresentation was the publication of a single work, musical compositions in *Margo* and *Weber* and a comic book character in *Netzer,* and the courts barred the Lanham Act claims because the first publication of the work predated the commencement of the suit by several years, which was enough to remove the respective suits from the statute of limitations. In this case, however, plaintiff alleges several affirmative acts of misrepresentation beyond mere publication of the Makeup Designs, occurring at various points in time. Unlike the ongoing broadcast or performance of a piece of music or successive publications of a comic book character in a series of comic books, each act alleged by plaintiff is a distinct offense, and may be separately considered as a Lanham Act violation. *See, e.g., Gordon and Breach Science Publishers S.A. v. American Institute of Physics*, 859 F.Supp. 1521 (S.D.N.Y.1994) (dismissing as time-barred one of six claims of false advertising under section 43(a), and refusing motion to dismiss as to two others that occurred within six-year period); *cf. Stone v. Williams*, 970 F.2d 1043, 1049 (2d. Cir.1992) (treating each of plaintiff's copyright claims as "a distinct harm giving rise to an independent claim for relief").

Plaintiff claims that none of the alleged violations predated Napier's registration of his costume sketches on July 13, 1993. (Pl.'s Mem. Law at 26–27.) Accepting the allegations in the Complaint as true, the Court finds that all but one of defendants' alleged misrepresentations occurred within

six years of the commencement of this action, and thereby fall within the statute of limitations. In particular, the record reflects that plaintiff's claim regarding failure to credit and/or false representations on *Cats* playbills accrued more than six years prior to filing. Plaintiff has not provided any details as to which productions distributed the allegedly misleading playbills, and the Complaint states that the allegedly infringing productions began with the National II company in 1985. (Compl.¶¶ 68–72.) Thus the Court concludes that plaintiff either was aware, or should have been aware, of misrepresentations on the playbills before July 1993. It therefore dismisses this component of plaintiff's Lanham Act claim on statute of limitations grounds.[21]

█ Defendants also argue that dismissal of plaintiff's copyright ownership claims as time-barred bars plaintiff's assertion of a Lanham Act claim. (Def.'s Mem. Law at 22; Def.'s Rep. at 10–11.) In particular, defendants argue (as they did with regard to plaintiff's copyright infringement claim, *see supra*), drawing on *Merchant, supra,* 92 F.3d 51, that the "Lanham Act remedy is clearly a remedy that would flow from a declaration of authorship." (Def.'s Mem. Law at 22.) In support of this point, defendants rely on *Weber, supra,* 63 F.Supp.2d 458, stating that the *Weber* court "squarely held that a Lanham Act claim premised on a time-barred claim for copyright ownership must also be dismissed." (Def.'s Mem. Law at 11.) At issue in *Weber* were music compositions to two songs released by the music group Guns N' Roses. Plaintiff brought a Lanham Act claim, a claim for accounting of profits under state law, and two other state law claims against defendant, and asserted for the purposes of all claims that he was co-author of the songs in question. *See id.* at 461.

The court held, after dismissing all of plaintiff's claims on alternative grounds, that each of plaintiff's claims was precluded because they were premised on her alleged copyright rights, and "any copyright claims" that plaintiff could have brought were time-barred under the three-year statute of limitations. *See id.* at 467. The court did not "squarely" hold, nor did it imply, that a time-barred ownership claim, in and of itself, would preclude a Lanham Act claim based on rights implicated by that claim. Rather, such a claim can be barred only where, as in *Weber,* no other avenue for challenge of the copyright exists.[22] The plaintiff there only had raised an co-ownership claim, and once that was dismissed, there was no possibility of establishing ownership. *See id.* However, where, as here, the plaintiff has sufficiently alleged an infringement cause of action, a Lanham Act claim cannot be barred on the ground that her ownership claim is time-barred. *See Maurizio, supra,* 84 F.Supp.2d at 468 (holding that the mere dismissal of an ownership claim as time-barred does not mean that the court cannot consider the issue of ownership as part of plaintiff's Lanham Act claim). Defendants themselves acknowledge this possibility, asserting that "because plaintiff cannot cite an underlying copyright claim,

---

**21.** Contrary to plaintiff's suggestion, the Court declines to find that this is a "continuing wrong" that would extend the statute of limitations. (Pl.'s Mem. Law at 27–28.) Under the notion of a continuing wrong, "only the last infringing act need be within the statutory period." *Taylor v. Meirick,* 712 F.2d 1112, 1118 (7th Cir.1983); *see also Kahn v. Kohlberg, Kravis, Robert & Co.,* 970 F.2d 1030, 1039–40 (2d Cir.1992). Both the Second Circuit and the New York Court of Appeals have confined the "continuing wrong" theory to those contexts in which the equities of the situation clearly require it. *See Kregos v. As-* *sociated Press,* 3 F.3d 656, 662 (2d Cir.1993) (rejecting the theory as applied to copyright infringement actions); *Stone,* supra, 970 F.2d at 1049–50 (same); *Jensen v. General Electric Co.,* 82 N.Y.2d 77, 85, 603 N.Y.S.2d 420, 623 N.E.2d 547 (1993) (describing continuing-wrong exception as a "narrow common-law exception" to the general accrual rule).

**22.** The Court notes that the *Weber* court did not refer to *Merchant* in dismissing the plaintiff's Lanham Act claim.

her Lanham Act claim is time-barred." (Def.'s Rep. at 11.) However, underlying copyright claims, namely plaintiff's infringement claims, are present here. The Court therefore declines to bar plaintiff's Lanham Act claim simply because plaintiff's copyright ownership claims are time-barred.[23]

■ Nor is plaintiff's Lanham Act claim barred as duplicative of her copyright claims. In *Weber*, and most recently in *Armstrong v. Virgin Records, Ltd.*, *supra*, 91 F.Supp.2d 628, courts of this district have barred Lanham Act claims where the plaintiffs' trademark allegations merely restate the allegations of their copyright claims, and in particular, fail to show the "requisite affirmative action of falsely claiming originality beyond that implicit in any allegedly false copyright." *Weber*, *supra*, 63 F.Supp.2d at 464. In order for a Lanham Act claim to survive in addition to a copyright claim, "an aggrieved author must show more than a violation of the author's protected right to credit and profit from a creation". The author must make a greater showing that the designation of origin was false, was harmful, and stemmed from "some affirmative act whereby [the defendant] affirmatively represented itself as the owner." *Id.* at 463.

■ In this case, plaintiff pleads facts that are adequate to meet this burden. She does not allege merely that Napier's copyright registration is a false designation of origin, *see Lipton v. The Nature Co.*, 71 F.3d 464, 473; *Kregos v. Associated Press*, 937 F.2d 700, 710–11 (2d Cir.1991), or merely a failure to credit plaintiff for her Designs, *Weber*, *supra*, 63 F.Supp.2d at 463–64, *Armstrong*, *supra*, 91 F.Supp.2d at 633, although each constitutes an element of her claim. Rather, she also alleges affirmative misrepresentation of owner-

ship in, *inter alia*, the video version of *Cats* and press releases concerning the musical. This is enough, on a motion to dismiss, to make the greater showing necessary to assert a Lanham Act claim. *See Richard Feiner & Co.*, *supra*, 38 F.Supp.2d at 280 (refusing to dismiss Lanham Act claim for "reverse passing off" where, in addition to alleging false copyright attribution, defendants allegedly claimed, in a video and a book, that they were the owners and licensors of the plaintiff's copyrighted film works). In cases, such as the instant one, where a misappropriation is properly alleged, a Lanham Act claim is a viable alternative to a copyright action. *See Waldman Publ'g*, *supra*, 43 F.3d at 781 ("Through a copyright infringement action, a copyright owner may control who publishes, sells, or otherwise uses a work. Through a Lanham Act action, an author may ensure that his or her name is associated with a work when the work is used."); *cf. Tracy v. Skate Key, Inc.*, 697 F.Supp. 748, 751 (S.D.N.Y.1988) (holding, in the context of state law claims, that both passing off and reverse passing off claims involve the same additional element, misrepresentation or deception, that makes it "not equivalent to any of the exclusive rights" of copyright law recognized in the statute) (citing 1 Nimmer, *supra*, § 1.01[B][1] n. 47 at 1–14, 1–14.1).

■ Finally, the Court refuses to find that plaintiff's Lanham Act claim is barred by the doctrine of laches. Laches is an equitable affirmative defense employed instead of the statutory time bar. *See Conopco*, *supra*, 95 F.3d at 191. When a suit is brought within the statute of limitations, or in Lanham Act cases within the time fixed by analogous statute, the burden is on the defendant to establish laches. *See id.* (citing *Leonick v. Jones & Laughlin Steel Corp.*, 258 F.2d 48, 50 (2d

---

23. The fact that the specific parameters of ownership have not been settled in this case is precisely why plaintiff's Lanham Act claim may be maintained. Details regarding ownership of the Makeup Designs will be a cen-

tral consideration in the Court's treatment of plaintiff's infringement claims, and will also determine the extent of the alleged misrepresentation, if any, embodied by the Lanham Act claim.

Cir.1958)); *cf. id.* at 191–92 (noting that when a suit is brought outside of the statute of limitations a presumption of laches attaches which must be rebutted by the plaintiff). In order to prevail, a defendant must prove that it has been prejudiced by the plaintiff's unreasonable delay in bringing the action. *See Tri–Star Pictures Inc. v. Leisure Time Prods., BV,* 17 F.3d 38, 44 (2d Cir.1994). A defendant has been prejudiced when the assertion of a claim available some time ago would be "inequitable" in light of the delay in bringing that claim. *See Conopco, supra,* 95 F.3d at 192. Specifically, prejudice is present when a "defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed." *Id.* (quoting *Goodman v. McDonnell Douglas Corp.,* 606 F.2d 800, 808 n. 17 (8th Cir.1979)). Given the fact-specific nature of a court's inquiry, the determination of laches is dependent "on the circumstances peculiar to each case." *Tri–Star, supra,* 17 F.3d at 44.

 The defense of laches is not appropriately raised in a motion to dismiss, unless "it is clear on the face of the complaint and plaintiff can prove no set of facts to avoid the insuperable bar." *Lennon v. Seaman,* 63 F.Supp.2d 428, 439 (S.D.N.Y.1999). With regard to the instant Lanham Act claim, the Complaint and motion papers raise several issues of fact with regard to laches. Plaintiff alleges that defendants have committed certain acts beginning in 1993 that have resulted in a misattribution of the copyrights in the Makeup Designs. Because plaintiff did not file suit to assert her rights with regard to any acts until 1999, there is a possibility of prejudice to defendants. However, it is not clear from the face of the Complaint that prejudice resulted from the delay, and, as plaintiff points out, defendants have not argued for, or demonstrated prejudice. Defendants' assertion of laches in their motion to dismiss is based solely on their incorrect conclusion that because the statute of limitations has run, the presumption of laches inures to

defendants. (Def.'s Mem. Law at 23.) Defendants have not asserted prejudice in the alternative, and they point to no specific facts in the Complaint that would support such a finding. Moreover, plaintiff alleges that the defense of laches is unavailing because defendants' acts were wilful and intentional, and because of defendants' unclean hands. (Pl.'s Mem. Law at 28–29.) The Court declines to dismiss plaintiff's Lanham Act claim on laches grounds, because "the factual allegations in the pleadings do not afford the Court sufficient basis for weighing the reasons for [plaintiff's] delay against the prejudice to [defendants] caused by that delay." *Fort Knox, supra,* 47 F.Supp.2d at 484 n. 1; *see also Lennon, supra,* 63 F.Supp.2d at 439 (denying motion to dismiss that claimed laches where the action was "so replete with allegations from both sides that a ruling on the defendant's defense of laches would necessarily involve a fact-intensive analysis and balancing of equities that would require the Court to consider matters outside the pleadings"); *cf. Armstrong, supra,* 91 F.Supp.2d at 643–44 (refusing to dismiss plaintiff's claims on laches grounds given the fact-intensive and conflicting allegations asserted by the parties).

Thus, the Court finds that plaintiff's Lanham Act claim is barred neither by the statute of limitations nor by laches. Since plaintiff has sufficiently pleaded a Lanham Act cause of action, the Court denies defendants' motion to dismiss this claim.

## IV. Antitrust Claim

Plaintiff's fourth cause of action alleges that defendants' prevented plaintiff from exploiting her copyright in the Makeup Designs, which constitutes a conspiracy in restraint of interstate trade in violation of section 1 of the Sherman Act and section 15 of the Clayton Act. (Compl. ¶ 201; Pl.'s Mem. Law at 31–32.) Defendants contend, *inter alia,* that this claim should be dismissed because plaintiff has not adequately pleaded either a relevant product

market or an antitrust injury. The Court agrees.[24]

## A. Relevant Product Market

Defendants first contend that plaintiff has inadequately defined the relevant product market that is allegedly being affected. "As a prerequisite to any antitrust claim, plaintiff must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed." *Smith & Johnson, Inc. v. Hedaya Home Fashions, Inc.*, No. 96 Civ. 5821, 1996 WL 737194 *5 (S.D.N.Y. Dec. 26, 1996) *aff'd*, 125 F.3d 844 (2d Cir. 1997); *accord Sage Realty Corp. v. ISS Cleaning Servs. Group, Inc.*, 936 F.Supp. 130, 135 (S.D.N.Y.1996). A relevant product market is one that "includes all products reasonably interchangeable, determination of which requires consideration of cross-elasticity of demand." [25] *Re–Alco Indus., Inc. v. Nat'l Center for Health Educ., Inc.*, 812 F.Supp. 387, 391 (S.D.N.Y. 1993) (citing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)). "A plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal." *Global, supra*, 960 F.Supp. at 705 (collecting cases); *see Re Alco, supra*, 812 F.Supp. at 392 ("If a complaint fails to allege facts regarding substitute products, to distinguish among apparently compara-ble products, or to allege other pertinent facts relating to cross-elasticity of demand ... a court may grant a Rule 12(b)(6) motion.").

In this case, plaintiff defines the relevant product market as the market for licensing the Makeup Designs and other *Cats*-related intellectual property "for uses that range from merchandise and promotion to theatrical productions and filmed versions." (Compl.¶ 204.) Plaintiff asserts that the *"Cats* products" at issue here are *"sui generis,"* and are therefore not interchangeable "with any other available product." (Pl.'s Mem. Law at 34; Complaint ¶ 144.) However, the plaintiff "in an antitrust case must allege a plausible basis for finding that the commodities which are in some way unique ... are a *market unto themselves"* in order to establish that alleged market is the "relevant, economically significant market." *Re–Alco, supra*, 812 F.Supp. at 391 (emphasis added); *see also Theatre Party Associates Inc. v. Shubert Org., Inc.*, 695 F.Supp. 150, 154 (S.D.N.Y.1988) (dismissing antitrust claim where plaintiff could not provide "a theoretically rational explanation to support its proposed relevant product market" of tickets for one particular Broadway show); *Gianna Enterprises v. Miss World (Jersey) Ltd.*, 551 F.Supp. 1348, 1354 (S.D.N.Y.1982) (finding that plaintiff had not provided "at least a theoretically rational explanation" for restricting relevant

---

24. The Court notes that although plaintiff's fourth claim is asserted under section 1 of the Sherman Act, the facts alleged could be construed to state a claim under section 2 of the Act, which proscribes monopolization or attempted monopolization of trade or commerce. 15 U.S.C. § 2. (Compl. ¶ 204, stating that defendants have "monopoly power and have wilfully attempted to extend this ·monopoly by usurping plaintiff's copyrights and destroying her ability to compete.") Accordingly, the Court construes the Complaint as alleging that defendants have intentionally dominated the market for the Makeup Designs and other *Cats* intellectual property rights in order to create and/or maintain a monopoly. However, to state a claim under either section of the Sherman Act, plaintiff must adequately define a relevant product

market and an antitrust injury. *See Global Discount Travel Servs. v. Trans World Airlines, Inc.*, 960 F.Supp. 701, 704 (S.D.N.Y.1997) (relevant product market); *Discon Inc. v. Nynex Corp.*, 86 F.Supp.2d 154 (W.D.N.Y. 2000) (antitrust injury). For the reasons stated in text *infra*, plaintiff has failed to do so. Accordingly, the fourth cause of action is dismissed whether asserted pursuant to section 1 or section 2 of the Sherman Act. *See Global, supra*, 960 F.Supp. at 706.

25. "Cross-elasticity of demand" refers to the change in the demand for one product as a result of a change in the price of another product. *See Smith, supra*, 1996 WL 737194, at *5 n. 5.

market to one particular beauty pageant in order for antitrust claim to survive 12(b)(6) motion). The fact that the Makeup Designs are allegedly *sui generis* is not a plausible basis for finding the Makeup Designs a "market unto themselves." Courts in this district have rejected the proposition that allegedly unique products, by virtue of customer preference for that product, are "markets unto themselves." *See, e.g., Global, supra,* 960 F.Supp. at 705 ("A consumer might prefer ... Pepsi because she prefers the taste, or NBC because she prefers "Friends," "Seinfeld," and "E.R." ... but at base, Pepsi is one of many sodas, and NBC is just another television network. Likewise, tickets on TWA are like tickets on any other airline."); *cf. Shubert, supra,* 695 F.Supp. at 154 (finding *Phantom of the Opera* similar to other forms of entertainment); *Frito–Lay, Inc. v. Bachman Co.,* 659 F.Supp. 1129, 1137 (S.D.N.Y.1986) (finding corn chips interchangeable with other salty snacks); *Shaw v. Rolex Watch, USA, Inc.,* 673 F.Supp. 674, 679 (S.D.N.Y.1987) (finding Rolex watches interchangeable with other high quality watches); *Gianna, supra,* 551 F.Supp. at 1354 (finding Miss World and Miss Universe pageants are interchangeable with other beauty pageants).

Plaintiff contends that, regardless of customer preference, one brand or product may constitute a relevant product market. However, "the law is clear that the distribution of a single brand, like the manufacture of a single brand, does not constitute a legally cognizable market." *Global, supra,* 960 F.Supp. at 705; *Re–Alco, supra,* 812 F.Supp. at 391 (citation omitted); *see also Discon, supra,* 86 F.Supp.2d at 161 ("[T]o define the relevant product market as that group of products over which defendants' anticompetitive conduct exercises control ... as an analytic matter reads the market definition step out of the Sherman Act") (citation and internal quotation marks omitted). Plaintiff's analysis of *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 482, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), which plain-

tiff cites for support, is flawed. In *Kodak,* service and spare parts for Kodak equipment were not interchangeable with those of any other manufacturer and had to be purchased from Kodak. The Supreme Court found the Kodak equipment to constitute a relevant product market because owning the equipment compelled customers to continue to buy Kodak parts. *See id.* Here there is nothing in the record to indicate compulsion. Customers can freely choose to purchase or not to purchase *Cats* products as opposed to those of, for example, other shows, based on their individual preference. Moreover, it is customer preference, not any sort of compulsion, that leads to licensing of the Makeup Designs. It is simply not true that licensees and consumers are "locked in." (Pl.'s Mem. Law at 35.) *Kodak'* s narrow exception for a one brand market is inapposite. *See Global,* 960 F.Supp. at 705–06 (finding *Kodak* inapposite because decision to purchase specific brand was not product-driven but based on customer preference). Plaintiff has failed to allege any plausible basis for the narrow market that she asserts.

Moreover, there are readily available substitutes for licensing the Makeup Designs and other *Cats*-related intellectual property. Nothing in the Complaint explains why products associated with other Broadway shows or other forms of entertainment are not reasonably interchangeable with products associated with *Cats. See Shubert, supra,* 695 F.Supp. at 154–55 (rejecting relevant product market that centered on a specific Broadway show, *Phantom of the Opera,* because "other forms of entertainment, namely other Broadway shows, the opera, ballet or even sporting events" would provide "adequate substitute products"); *Belfiore v. The New York Times Co.,* 826 F.2d 177, 180 (2d Cir.1987) (rejecting as "implausible" that a relevant product market could be comprised of the *New York Times* newspaper as a "general interest daily newspaper directed primarily to upscale readers" because substitutes

reasonably included all "general circulation daily newspapers"). The Court concludes that there is little reason to believe that the market for the Makeup Designs is so wholly segmented from the available substitutes that a rise in the price for the Makeup Designs would not shift demand to some of the alternatives. *See Smith, supra*, 1996 WL 737194, at \*6 (concluding same for wholesale afghans).[26] Accordingly, plaintiff's claim is dismissed for failure to adequately plead a relevant product market.

## B. Antitrust Injury

The second element required to assert a cognizable Sherman Act claim·is antitrust injury. *See Sage, supra*, 936 F.Supp. at 135 (citing *Brunswick Corp. v. Pueblo Bowl–O–Mat Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)) (internal quotations omitted); *Discon, supra*, 86 F.Supp.2d at 159 ("A private plaintiff seeking to state a claim for violation of §§ 1 or 2 of the Sherman Act must allege that it has suffered 'antitrust injury'.") (citations omitted) Even were the Court to find that plaintiff has adequately alleged a relevant product market, plaintiff's failure to allege a cognizable antitrust injury warrants dismissal.

■■■ The antitrust injury requirement stems from the fundamental principle that "[t]he antitrust laws ... were enacted for the protection of competition, not competitors." *Brunswick, supra*, 429 U.S. at 488, 97 S.Ct. 690 (citations and internal quotations omitted). To satisfy the antitrust injury requirement, a plaintiff must show that "the challenged action has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice." *Capital Imaging As-*

socs. *P.C. v. Mohawk Valley Medical Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir.1993); *see also Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 343–44, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) ("The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.").

■■■ Here, plaintiff alleges "manifest" antitrust injury because plaintiff's inability to license or market the Makeup Designs has caused a "reduction in output" of products using the Makeup Designs. (Compl.¶ 145.) Plaintiff also asserts that defendants' products are of poor quality. (Pl.'s Mem. Law at 33.) These are conclusory allegations with no support in the Complaint, and do not adequately plead antitrust injury. In particular, plaintiff's statement that output was reduced is not supported by any statement or indication that there were fewer *Cats* products licensed or sold. Plaintiff's elimination from the market simply does not equate to reduced output. *See Discon, supra*, 86 F.Supp.2d at 163 (holding that, where plaintiff asserted "reduced output" and other harms, "none of these conclusory statements ... is sufficient to support an inference of market-wide anticompetitive harm"); *US Airways Group, Inc. v. British Airways PLC*, 989 F.Supp. 482, 489 (S.D.N.Y.1997) ("[Plaintiff's] general and conclusory allegation" that plaintiff's exclusion from the market has "limited consumer choice for air carriers ... do[es] not sufficiently allege the antitrust injury required for standing"); *see also Rock TV Entertainment, Inc. v. Time Warner, Inc.*, No. 97 Civ. 0161, 1998 WL 37498,\*4 (S.D.N.Y. Jan. 29, 1998) ("[Because] Rock TV has not suggested any supporting

---

**26.** In this regard, the Court notes that plaintiff's reliance on *Vitale v. Marlborough Gallery*, 32 U.S.P.Q.2d 1283 (S.D.N.Y.1994) is equally flawed. In that case, while the court dismissed plaintiff's antitrust claim as untimely, it found that paintings by the modern artist Jackson Pollack could constitute a relevant antitrust market because Pollock's paintings were motivated by "highly subjective tastes," and so unique that there was no practical substitute. *See id.* at 1286. Plaintiff has alleged no facts that would show that such a market is present in the instant case.

facts, such as the size of the relevant product [market] ... or the amount of competition that defendants' actions foreclosed ... its allegations are conclusory and, therefore, insufficient for an antitrust complaint.").

Further, plaintiff's own allegations of infringement contradict her assertions that there has been a reduction in output that would harm the public. The Complaint is replete with statements that the Makeup Designs have been made widely available to the public through *Cats* productions around the world and through merchandise marketed by defendants, including a coloring book, a video, and a makeup kit. (Compl.¶¶ 17, 67, 101, 102, 185.) Plaintiff's allegations therefore support the conclusion that her alleged exclusion from the market for licensing the Makeup Designs has had negligible effect on output and has chiefly prevented plaintiff from generating revenue. *Cf. Discon, supra,* 86 F.Supp.2d at 164 (concluding that plaintiff's elimination from the market "simply does not equate to 'reduced output'" because, while plaintiff made fewer sales, the complaint alleges that another seller took plaintiff's place). The Court finds that plaintiff has only alleged harm to plaintiff, not the market, and that plaintiff sets forth no facts upon which a court could find competition-reducing antitrust injury. *See National Assoc. of Freelance Photographers v. Associated Press,* 45 U.S.P.Q.2d 1321, 1329, 1997 WL 759456 (S.D.N.Y.1997) (holding that allegations were "wholly conclusory, but more importantly fail to demonstrate the requisite effect on 'competition, not competitors'"); *Re–Alco, supra,* 812 F.Supp. at 392 (finding no antitrust claim because plaintiff had not sufficiently alleged "an anticompetitive effect on the industry as a whole").

Plaintiff's antitrust claim also alleges "per se violations" of section 1 of the Sherman Act. (Compl.¶¶ 142, 202). In most cases, in determining whether conduct restrains competition in violation of the antitrust laws, a rule-of-reason analysis is applied which requires a showing of antitrust injury. *See Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). However, in limited circumstances the "challenged action falls into the category of 'agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused.'" *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 289, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) (citation omitted).

As defendants point out, (Def.'s Rep. at 13–14), the application of the per se rule is limited to very few forms of illegal conduct. In particular, the per se rule has been limited to situations where one entity attempts to disadvantage a competitor by coercing necessary suppliers or customers to cut off their relationship with the competitor. *See e.g., Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (finding per se violation where retailer and manufacturers conspired to cut off supply to competing retailer); *Fashion Originators' Guild of America v. Federal Trade Commission,* 312 U.S. 457, 312 U.S. 668, 61 S.Ct. 703, 85 L.Ed. 949 (1941) (finding per se violation where clothing manufacturers coerced retailers not to purchase clothing from competing clothing manufacturers). Plaintiff has not alleged similar conduct on the part of defendants in this case, as her only allegation is that defendants' "control over all other *Cats* intellectual property ... gives them access to all potential licensees of the Designs" and excludes plaintiff from the market. (Pl.'s Mem. Law at 32.) Accordingly, plaintiff must allege specific antitrust injury in order to maintain her antitrust claims. Since, as discussed *supra,* plaintiff has not done that here, her allegations of a per se antitrust violation must fail.

## V. Jurisdiction over RUT, RUF, and RUH

Defendants move to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction over defendants RUT, RUF, and RUH.[27] These defendants are foreign corporations organized under the laws of the United Kingdom. (Compl. ¶¶ 166–68; Def.'s Mem. Law at 34.) Defendants assert that plaintiff cannot establish jurisdiction over these defendants because plaintiff has only alleged "unspecified conduct" without establishing any nexus between the defendants and New York state. (Def.'s Mem. Law at 34.) In particular, the Complaint does not allege that these defendants were "engaged in any conduct in the State of New York or performed a tortious act within New York." (*Id.*)

■ Prior to discovery, a plaintiff challenged by a jurisdiction-testing motion may defeat the motion by making a prima facie showing of jurisdiction, that is, by pleading legally sufficient allegations of jurisdiction. *See Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir.1998). For claims arising under Federal law, such as those in the instant case, personal jurisdiction is determined by the law of the forum state, which in this case is New York. To determine the existence of personal jurisdiction over a non-domiciliary corporation, the courts of this district apply a "doing business" test, under CPLR 301, or New York's long-arm statute, under CPLR § 302(a). *See, e.g., id.* at 184; *Editorial Musical Latino Americana, S.A. v. Mar Int'l Records*, 829 F.Supp. 62, 64–66 (S.D.N.Y.1993) (finding jurisdiction by applying New York's long-arm statute).

■ Under CPLR 301, New York courts may exercise personal jurisdiction over a foreign corporation that is "engaged in such a continuous and systematic course of 'doing business' in New York as to warrant a finding of its 'presence' in [the state]," even if the cause of action is unrelated to the defendant's New York activities. *See Jazini, supra,* 148 F.3d at 184 (citations omitted). Without any physical presence in New York, a foreign defendant may be subject to suit in New York if it conducts, or purposefully directs, business " 'not occasionally or casually, but with a fair measure of permanence and continuity.' " *Anderson v. Indiana Black Expo, Inc.*, 81 F.Supp.2d 494, 500 (S.D.N.Y.2000) (citations omitted). The traditional indicia of such "permanence and continuity" include: "1) the existence of an office in New York; 2) the solicitation of business in New York; 3) the existence of bank accounts or other property in New York; and 4) the presence of employees in New York." *Drucker Cornell v. Assicuraziono Generali S.p.A. Consolidated*, No. 97 Civ. 2262, 2000 WL 284222, at *2 (S.D.N.Y. Mar. 16, 2000) (citing *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir.1985)).

■ The "doing business" test is not applicable to any of the defendants at issue here, because plaintiff does not allege that they conducted business in New York with any regularity. None of the three defendants have a physical presence in New York, and plaintiff does not allege that any of the traditional indicia are present. Plaintiff merely alleges that each of the defendants is "among the producers or licensors" of *Cats* productions and other allegedly infringing works, that RUT and RUH "participated in some or all" of the infringements, and that RUT and RUF are credited on the allegedly infringing

---

**27.** Defendants dispute the existence of RUF, stating that no company named "Really Useful Films, Ltd." exists. (Declaration of Jonathan Hull dated September 24, 1999 ("Hull Decl.") ¶ 2.) Plaintiff notes that "Really Useful Films, Ltd." was the name that appeared in the credits on the allegedly infringing *Cats* video. (Jobin Aff. ¶ 7.) Defendants state that the name is similar to the names of two entities that do exist: (i) The Really Useful Film Co., Ltd.; and (ii) The Really Useful Film Co., Inc. (Hull Decl. ¶ 2.) For the purposes of the motion to dismiss, defendants have treated RUF as though it were "The Really Useful Film Co., Ltd." (Def.'s Mem. Law ¶ 34 n. 14.)

video. (Compl. ¶¶ 166–168; Jobin Aff. ¶ 7; *see also* Hull Decl. ¶¶ 3–4 (stating that none of the London-based corporations have been regularly engaged in the conduct of business in New York)). In fact, plaintiff does not allege any business activity that would establish a nexus between these defendants and New York state. *Cf. Singer v. Bell*, 585 F.Supp. 300, 303 (S.D.N.Y.1984) (granting 12(b)(2) motion to dismiss where plaintiffs failed to "come forward with some definite evidentiary facts to connect the defendant with transactions occurring in New York").

▉ For similar reasons, the New York long arm statute is unavailing as a basis for jurisdiction over any of the three defendants. New York's long-arm statute provides, in relevant part:

(a) . . . As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

(1) transacts any business within the state or contracts anywhere to supply goods or services in the state; or

(2) commits a tortious act within the state . . .; or

(3) commits a tortious act without the state causing injury to a person or property within the state . . . if he

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce. . . .

CPLR § 302(a). It is evident, and plaintiff does not contest, that section 302(a)(1), the "transaction of business" subsection of the statute, is inapplicable, because none of the defendants allegedly transacted business within New York, or contracted to supply goods to the state. (Pl.'s Mem. Law at 37–38.)

However, plaintiff asserts that both 302(a)(2) and 302(a)(3) are applicable here. In particular, plaintiff claims that there is jurisdiction under 302(a)(2) because copyright and trademark infringement "are torts that are deemed to take place where the harm occurs—in this case, New York." (Pl.'s Mem. Law at 38.) Indeed, courts in this circuit have held that "[o]ffering one copy of an infringing work for sale in New York . . . constitutes commission of a tortious act within the state sufficient to imbue this Court with personal jurisdiction over the infringers." *Editorial Musical Latino Americana, S.A., supra*, 829 F.Supp. at 64 (citing cases). Only a single tortious act is required to trigger the provision, and no other local activities are required. *See Pilates, Inc. v. Pilates Inst., Inc.*, 891 F.Supp. 175, 180 (S.D.N.Y.1995). Plaintiff alleges that jurisdiction is clear because the video "was sold in New York and aired on PBS." (Pl.'s Mem. Law at 38.) However, plaintiff does not allege any affirmative act on the part of RUT and RUF that would constitute a tort committed by these defendants. Plaintiff maintains only that these two defendants were credited on the video. The fact that the video was sold in New York, without more, therefore is not sufficient to establish jurisdiction under CPLR 302(a)(2). Moreover, RUH, on plaintiff's facts, was not directly involved with the video.

▉ Plaintiff further alleges that creation of the video would constitute an act outside of the state causing injury to those within the state, as contemplated by CPLR 302(a)(3). (*Id.*) Plaintiff alleges that the international financial success of the video leads to the inference that the three defendants derived substantial revenue from its sale, thus meeting the requirements of subsections (i) and (ii) of the provision. (*Id.*) "[C]ourts determining whether there is an injury in New York sufficient to warrant § 302(a)(3) jurisdic-

tion generally apply a situs-of-injury test, which asks them to locate the 'original event which caused the injury.'" "This 'original event' is, however, generally distinguished not only from the initial tort but from the final economic injury and the felt consequences of the tort." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 791 (2d Cir.1999). The original event has been described as "the first effect of the tort that caused the injury." *Id.* at 792. In this case, nothing in the record indicates that the original event occurred in New York, only that the harm from the infringement occurred in New York. *Cf. Vista Food Exchange v. Joyce Foods, Inc.*, No. 96 Civ. 0012, 1996 WL 122419, at*3 (S.D.N.Y. March 20, 1996) (noting that a section 302(a)(3) injury "does not occur in New York just because the plaintiff is domiciled or does business there, even when plaintiff suffers some economic harm in New York because of defendant's out-of-state conduct"). On the contrary, because the video was taped in England and the first effects were presumptively felt there, (Compl.¶ 165), it would appear that the original event giving rise to plaintiff's alleged injury occurred outside of New York. Plaintiff has not pleaded any facts that would warrant an alternative conclusion.

Even if it could be established that the situs-of-injury for certain of the alleged infringements was New York, jurisdiction under section 302(a)(3) would still not lie because plaintiff is unable to point to a tortious act committed by these defendants. Being credited on a video does not imply creation, nor does it indicate an expectation of revenue from the video's distribution in New York, or in interstate or international commerce. Further, as the Court noted *supra* with regard to section 302(a)(2), jurisdiction over RUH is also precluded because plaintiff has not alleged that RUH was involved in any specific tortious conduct.

For the above reasons, the Court grants defendants' 12(b)(2) motion to dismiss as to defendants RUT, RUF and RUH.

## VI. Claims Against Individual Defendants [28]

Defendants move to dismiss the claims against individual defendants Schoenfeld and Webber, pursuant to Rule 12(b)(6), alleging that the Complaint fails to identify actionable conduct committed by these defendants. In particular, defendants allege that the Complaint violates the notice pleading requirements of Fed.R.Civ.P. 8 ("Rule 8") because it "fails to even provide the minimal level of detail as to the claims allegedly asserted against the individual defendants." (Def.'s Mem. Law at 38.) They assert that plaintiff is required to provide "specific instances or concrete examples" of wrongdoing. (*Id.*) Plaintiff responds that they have adequately pleaded particularized facts, and that even if Schoenfeld and Webber are not directly liable for copyright and trademark infringement, the facts pleaded meet the standards for vicarious and contributory liability.

 Rule 8 requires that a pleading provide at a minimum "a short and plain statement of ... the claim showing that the pleader is entitled to relief." Rule 8. Copyright infringement claims require that the pleader state "by what acts and during what time the [defendants] infringed the copyright." *Twinlab Corp. v. Signature Media Servs., Inc.*, No. 99 Civ. 169(AGS), 1999 WL 1115237, at *5 (Dec. 7, 1999 S.D.N.Y.). Corporate officers can be held vicariously liable for copyright infringement if they had (i) the right and ability to supervise the infringing activity; and (ii) an obvious and direct financial interest in exploitation of copyrighted materials. *See Luft v. Crown Publishers, Inc.*, 772 F.Supp. 1378, 1380 (S.D.N.Y. 1991). Lanham Act "reverse passing off"

---

**28.** Defendants assert that the claims against defendants Mackintosh and Geffen should be dismissed on the same grounds. (Def.'s Mem. Law at 38 n. 16.) These claims will be discussed as part of the Court's analysis *infra.*

claims require, *inter alia*, an allegation as to the acts by which misattribution was made. *See Waldman Publ'g, supra*, 43 F.3d at 781–85. In order to establish the individual liability of a corporate officer, a plaintiff must show that the officer "authorized and approved the acts of unfair competition" which are the basis of the corporations liability. *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F.Supp. 899, 913 (quoting *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir.1978)). Where it is established that the officer is a "moving, active conscious force" behind the infringement, "[it] is immaterial whether ... [he] knows that his acts will result in an infringement." *Id.* at 913–914 (quoting *Polo Fashions, Inc. v. Branded Apparel Merchandising, Inc.*, 592 F.Supp. 648 (D.Mass.1984)). Contributory infringement holds liable "[o]ne who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another ..." *Demetriades v. Kaufmann*, 690 F.Supp. 289, 292–93 (S.D.N.Y.1988) (citation omitted).

 With regard to defendant Webber, the Court finds that plaintiff's Complaint complies with the requisite pleading requirements for vicarious liability for copyright and trademark infringement. In particular, plaintiff alleges that Webber, as "sole or majority owner of the Really Useful business entities ... authorize[d] or licensed many of the infringing uses of the Makeup Designs." (Compl. ¶ 178.) She alleges that much of Webber's personal fortune was derived from Cats. (*Id.* ¶ 18.) These allegations imply the ability to supervise and a financial interest necessary for copyright infringement. Plaintiff also alleges that Webber participated in the infringements of the plaintiff's copyrights. (*Id.* ¶¶ 178). On the Lanham Act claim in particular, plaintiff claims that Webber "is responsible for misattributions of the Makeup Designs" and that he participated in trademark infringement by "willfully" depriving her of authorship credit. (*Id.* ¶ 196.) These allegations of participation,

in concert with plaintiff's allegations regarding authorization, sufficiently plead a Lanham Act cause of action.

However, the Court finds that plaintiff's allegations concerning defendants Schoenfeld, Mackintosh, and Geffen are insufficient to meet the requisite pleading requirements. Plaintiff merely states that Schoenfeld is "Chairman of Defendant The Shubert Organization," was "credited" on the allegedly infringing video, was "copied" on a letter "threatening" plaintiff with legal action for preparing a coloring book based on the Makeup Designs, and did not respond to her "personal appeals." (*Id.* ¶¶ 161, 177; Jobin Aff. ¶¶ 6–7). Mackintosh is alleged to be "a sole or part owner" of defendant Cameron Mackintosh, Inc. and "a producer and/or licensor of infringing *Cats* productions." (*Id.* ¶ 180.) Geffen is simply alleged to be a "producer" of *Cats* with a sizable investment in the musical. (*Id.* ¶¶ 18, 179.) While each is alleged to have "participated in some if not all" of the infringements, no details are provided. (*Id.* ¶¶ 177, 179, 180.) Absent from the Complaint is any description of acts that could lead to the conclusion of direct copyright or trademark infringement, or allegations of authorization or participation that would indicate vicarious liability or contributory infringement.

Therefore, the Court grants defendants' motion to dismiss as to defendants Schoenfeld, Mackintosh, and Geffen, but denies the motion as to Webber.

### CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is granted as to plaintiff's claim for a declaration of sole copyright ownership, an accounting for profits, antitrust remedies under the Sherman and Clayton Acts, and denied as to plaintiff's copyright infringement and Lanham Act claims. The Court also dismisses plaintiff's claims as to corporate defendants RUT, RUF, and RUH, and as to

individual defendants Schoenfeld, Mackintosh and Geffen.

SO ORDERED.